# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ROME DIVISION

-----------------------------------------------------------x
:
FIELDTURF USA INC., FIELDTURF INC.,           :
and FIELDTURF TARKETT SAS,                     :
                                               :
                            Plaintiffs,        :
                                               :    CIVIL ACTION
            - against -                        :
                                               :    FILE NO. _____
                                               :
TENCATE THIOLON MIDDLE EAST, LLC              :
f/k/a MATTEX LEISURE INDUSTRIES,               :
POLYLOOM CORPORATION OF AMERICA :
d/b/a/ TENCATE GRASS NORTH AMERICA, :
and TENCATE THIOLON B.V.,                      :
                                               :
                            Defendants.        :
                                               :
-----------------------------------------------------------x

## COMPLAINT

       Plaintiffs FieldTurf USA Inc., FieldTurf Inc. and FieldTurf

Tarkett SAS (collectively "FieldTurf"), by and through their attorneys

Nations, Toman & McKnight LLP and Friedman Kaplan Seiler & Adelman

LLP, for their complaint against defendants TenCate Thiolon Middle East,

LLC, Polyloom Corporation of America d/b/a TenCate Grass North America

and TenCate Thiolon B.V. (collectively, "TenCate"), respectfully allege as follows:

## **INTRODUCTION**

1.

This is an action for fraudulent inducement of contract, breach of contract and warranty, and preliminary and permanent injunctive relief. It arises out of a bait-and-switch scheme employed by Mattex Leisure Industries ("Mattex") and its successor TenCate Thiolon Middle East LLC against one of their largest and most loyal customers. FieldTurf, a manufacturer of artificial grass turf systems, was induced to enter supply agreements with Mattex, and later TenCate, by representations that its monofilament artificial grass fiber was superior to the fiber supplied by its competitors. These representations were bolstered by physical product samples and test results that Mattex touted to convince FieldTurf of the suitability and superiority of its product. Impressed by the appearance of Mattex's monofilament fiber and swayed by its performance under test conditions, FieldTurf committed to buying the fiber for use in its construction of football fields, soccer fields and other artificial grass turf systems around the globe.

2

2.

Once it secured a contract with FieldTurf, Mattex changed its fiber formula and the manufacturing process that it used to create the fiber. Upon information and belief, Mattex stopped supplying the monofilament fiber that it had provided to FieldTurf to secure its business and, for some period of time, supplied a less expensive, less durable fiber. Upon information and belief, Mattex also made changes to the fiber's extrusion process in order to reduce costs and raise output, further diminishing the durability of its fiber and increasing the likelihood of premature fiber degradation under certain conditions.

3.

In addition, Mattex failed to manufacture this cheaper, less durable fiber with an adequate amount of the ultraviolet ("UV") stabilizers required to prevent loss of tensile strength, increasing its premature disintegration during the warranty period. In some cases, Mattex shipped FieldTurf fibers that contained no commonly known UV stabilizers. These changes resulted in batches of fiber that degraded prematurely and failed to meet contract specifications or live up to the terms of Mattex's warranty.

4.

For some period of time, TenCate continued supplying this

defective fiber when it acquired Mattex in February 2007 and formed the

new entity that is now TenCate Thiolon Middle East LLC. In addition, some

of the fiber that TenCate has supplied to FieldTurf for installation overseas

has exhibited visual defects in the form of "streaking," as explained more

fully below.

5.

As a result of Mattex and TenCate's misrepresentations and

breaches of contract and warranty, FieldTurf built more than 100 fields

using defective fibers that are degrading prematurely. In addition, more than

20 other fields are exhibiting visual defects in the form of streaking. The

customers who received fields built with defective fibers – primarily high

schools, colleges and universities whose football fields, soccer fields and

other sports fields are built using artificial turf systems – are looking to

FieldTurf to repair and, in many cases, fully replace their failing fields. To

date, FieldTurf already has spent approximately $4 million on these repairs,

and faces pending and future claims of tens of millions of dollars as a result

of failures of TenCate supplied fiber. FieldTurf also has suffered significant

damage to its reputation. TenCate is directly responsible for these losses, which FieldTurf believes to be in excess of $30 million.

6.

FieldTurf advised TenCate of its intention to assert claims arising from its supply of defective fiber and, in an effort to avoid litigation, initiated settlement discussions with TenCate. Instead of pursuing these discussions in good faith, TenCate – apparently believing that "the best defense is a good offense" – brazenly accused *FieldTurf* of breaching the parties' current contract and purported to terminate the agreement as of March 2, 2011, approximately three and one-half months prior to its June 15, 2011 termination date. TenCate further advised FieldTurf that it would not continue to supply any artificial grass products to FieldTurf beyond March 2, 2011.

7.

This early – and wholly unjustified – termination was significant for a number of reasons. First, it deprived FieldTurf of three months that were critical to its management of the transition away from TenCate, which has served as its sole supplier of artificial grass fiber for the last four years. Second and more specifically, it threatened to deprive

FieldTurf of access to a number of products – *other* than the defective

Evolution fiber – which FieldTurf was relying upon TenCate to supply

through the scheduled June 15, 2011 termination date.

8.

       The other products supplied by TenCate to FieldTurf are

necessary for FieldTurf's completion of a significant number of existing

customer contracts.  In many cases, the orders necessary to fulfill these

contracts have been outstanding for several months.

9.

       TenCate's bad faith refusal to fill FieldTurf's pre-existing

orders for products other than Evolution will deprive FieldTurf of access to

those products and could cause its default on a number of important, large-

scale projects of which TenCate has been aware for some time.  This will

result in irreparable harm to FieldTurf's business and reputation.

10.

       FieldTurf recently sought commercially reasonable assurances

from TenCate that all pending orders would be fulfilled before the early

March 2, 2011 termination date.  TenCate has not yet given such assurance,

suggesting that it may seek to "run out the clock" until its unjustified

termination of the Supply Agreement takes effect on March 2, 2011. This Court's immediate intervention is therefore urgently needed.

## THE PARTIES

11.

Plaintiff FieldTurf USA Inc. ("FieldTurf USA") is a Florida corporation with its principal place of business located at 175 North Industrial Blvd., N.E., Calhoun, Georgia 30701.

12.

Plaintiff FieldTurf Inc. ("FieldTurf Inc.") is a Canadian corporation with its principal place of business located at 8088 Montview Road, Montreal, Quebec, H4P 2L7.

13.

Plaintiff FieldTurf Tarkett SAS ("FieldTurf Tarkett") is a French corporation with its principal place of business located at 2 Rue de l'Egalite, 92748 Nanterre Cedex, France.

14.

Defendant TenCate Thiolon Middle East, LLC ("TenCate Middle East") is a limited liability company organized under the laws of the United Arab Emirates with its principal place of business located at Techno

Park – Plot number TP010104, Sheikh Zayed Road, P.O. Box 25628, Dubai, United Arab Emirates. TenCate Middle East is 51% owned by a United Arab Emirates entity and 49% owned by Royal TenCate, a Dutch entity with its principal place of business located at Stationsstraat 11, 7607 GX Alelmo, The Netherlands. Royal TenCate has 100% economic ownership of TenCate Middle East.

15.

Defendant Polyloom Corporation of America d/b/a TenCate Grass North America ("TenCate Grass") is a Delaware corporation with its principal place of business located at 1131 Broadway Street, Dayton, Tennessee, 37321.

16.

Defendant TenCate Thiolon B.V. ("TenCate Thiolon") is a Dutch limited liability company with its principal place of business located at G. van der Muelenweg 2, P.O. Box 9, 7440 AA Nijverdal, The Netherlands.

## JURISDICTION AND VENUE

### 17.

This Court has original and/or supplemental subject matter jurisdiction over all claims in this action pursuant to 28 U.S.C. §§ 1332 and 1367. Diversity jurisdiction exists under 28 U.S.C. § 1332(a)(3) because this is a dispute between citizens of different states and in which citizens of foreign states are additional parties. The amount in controversy, exclusive of interest and costs, well exceeds $75,000.

### 18.

This Court has personal jurisdiction over the defendants, who supply synthetic grass fiber to customers throughout the United States, including plaintiffs. Specifically, defendants supply fiber to FieldTurf USA's manufacturing plant in Calhoun, Georgia from their facilities in Dayton, Tennessee and Dubai. From 2005 through the present, defendants' representatives have conducted in-person meetings with FieldTurf representatives at FieldTurf USA's offices in Georgia and TenCate Grass' offices in Tennessee. TenCate representatives have also regularly communicated with FieldTurf representatives from managerial offices located in Union City, Georgia.

19.

In addition, each of the defendants has consented to this Court's jurisdiction under the terms of a July 1, 2008 Supply Agreement between plaintiffs and defendants. Section XIV of the Supply Agreement provides in relevant part: "The Parties to this Agreement hereby irrevocably consent and submit to the jurisdiction and forum of the United States District Court for the Northern District of Georgia or the Superior Court of Fulton County, Georgia in all questions arising out of this Agreement."

20.

Venue is proper under 28 U.S.C. § 1391(a)(2) because a substantial part of the events and omissions giving rise to plaintiffs' claims occurred in this district. As noted above, TenCate supplied defective fiber to FieldTurf at FieldTurf USA's manufacturing plants in Dalton and Calhoun, Georgia. Before its acquisition by TenCate Middle East, Mattex supplied defective fiber to FieldTurf at FieldTurf USA's prior locations in Dawnville, Georgia and Dalton, Georgia which, like Calhoun, are located in this district. In addition, certain of the misrepresentations giving rise to plaintiffs' fraud claims were made to FieldTurf USA employees in this district.

21.

Venue also is proper under the forum selection clause contained in Section XIV of the July 1, 2008 Supply Agreement cited above.

## FACTS RELEVANT TO CLAIMS FOR RELIEF

## Background:  A Description of FieldTurf's Artificial Turf Systems

22.

John Gilman and Jean Provost, both former professional athletes, founded FieldTurf in 1994.  Their mission was to put an end to the injuries that athletes had come to suffer routinely on synthetic turf by designing an artificial turf system that more closely resembled natural grass. FieldTurf accomplished that goal by rejecting the old turf systems that relied on an underlying shock pad for resilience and player comfort and, instead, by building systems of synthetic grass fibers surrounded and stabilized by "infill" – a patented mixture of sand and rubber granules that are similar to the soil found in natural grass.

23.

The main components of each FieldTurf system are artificial grass fibers, a permeable fabric backing into which the fibers are stitched or "tufted," and a mixture of sand and rubber that serves as the infill.  FieldTurf

obtains the grass fibers and fabric backing from TenCate; it receives from separate suppliers the sand and rubber used to create the infill.

24.

The fiber in each FieldTurf system is a form of extruded polyethylene polymer.  In those systems that are the subject of this complaint, the fiber has an "arched" profile that was designed to resemble grass.  Each fiber contains a central spine with "wings" on each side of the spine.

25.

The fiber is tufted into a permeable backing material in rows according to a spacing formula that enables cleats to penetrate the infill material rather than the fiber on the surface of the field.  This spacing formula is designed to provide traction and prevent player injuries.  Once tufted, coats of polyurethane are applied to the backing to secure the fibers in place.  Coating is either done as a complete layer with perforation to permit drainage or using FieldTurf's patented "finger unit" process, where coating is applied over the back of each row of stitching leaving the rest of the backing material open for drainage.  The tufting is then ready for the

installation and infill process. The infill is comprised of sand and recycled rubber particles (either ambient or cryogenic).

26.

Each field is manufactured to order at FieldTurf's manufacturing plants in Calhoun, Georgia (the production location for FieldTurf USA and FieldTurf Inc.) and Auchel, France (the production location for FieldTurf Tarkett SAS).

27.

In addition to the sports fields described above, FieldTurf manufactures landscaping systems, golf courses and putting greens, playgrounds and other recreational systems.

### The Shift from "Slit-Film" Tape to Monofilament Fiber

28.

Until 2004, FieldTurf built its artificial turf systems exclusively with "slit-film" tape, which fibrillates along a honeycomb pattern after use. Fields manufactured with slit-film tape became popular beginning in 2000 because of their aesthetic quality and player friendliness. However, slit-film tape had long-term durability issues largely attributable to the way in which it was manufactured and installed.

13

29.

To manufacture slit-film tape, melted polymer is extruded into thin, flat sheets approximately five feet wide.  Each sheet is then cut into individual tapes, which are then cut again so that they have "slits" approximately 0.05 inches apart.  The tape is then twisted, tufted into the fabric backing, and coated with polyurethane.  During the infill process, the tape must be brushed repeatedly to prevent the infill from burying the fiber and to further split or "fibrillate" the tape so that the individual blades become more grass-like.  The long-term durability of slit-film products can be compromised both by the mechanical splitting of the tape during the manufacturing process and the brushing of the tape during installation.

30.

A number of fiber manufacturers, including Mattex and TenCate, developed monofilament fiber to address the long-term durability issues associated with slit-film products.[1]  Monofilament fiber is similar to slit-film tape in its chemical composition: it is comprised of a combination of polyethylene and a "Masterbatch" of other chemicals, including UV

---

[1] Slit-film products are still used in certain applications, including recreational areas, high-use training fields, baseball and softball fields.

14

stabilizers. However, monofilament fiber undergoes a different extrusion or manufacturing process. Melted polymer is pushed through a "spinneret," which is a multi-pored device designed to shape each individual fiber. What emerges from the extrusion line is not a flat sheet, but individual strands of fiber that resemble spaghetti. No further splitting or cutting of the strands is necessary. The individual strands are then wrapped together with a wrap yarn and passed through a machine for tufting. Once tufted, monofilament fiber looks much like it will when installed and does not need to be brushed and untwisted. Thus, the fiber is not compromised in the manufacturing process since it is not repeatedly cut, and is not partially destroyed in the installation process since it does not need to be brushed and untwisted.

31.

The fiber manufacturer is responsible for selecting a Masterbatch containing adequate UV stabilizer packages so that the extruded polymer is able to withstand long-term exposure to UV radiation. Adequate UV protection is crucial to any fiber's long-term durability. If a fiber is not provided with UV stabilizers of an adequate quality or amount, the fiber will fade, split and break down as it is exposed to the sun's rays over time.

15

32.

The fiber manufacturer is also ultimately responsible for ensuring that a monofilament fiber contains the desired mechanical properties. It is industry knowledge that the extrusion of monofilament polyethylene fiber is a highly technical process, which requires significant expertise and precise control of temperature and pressure levels. Small changes in extrusion settings (*e.g.*, line speed, capillary throughput, head pressure etc.) can dramatically impact a fiber's mechanical durability and resilience. If pressure and temperature are not kept under control, meaningful damage also can be done to the UV stabilizer packages themselves.

## Mattex Introduces "Evolution" Monofilament Fiber to FieldTurf

33.

In the early 2000's, the monofilament fibers on the market had very thin, flat blades. These fibers, which were prickly to touch, were used primarily in landscape projects.

34.

In 2003, Mattex introduced a new monofilament fiber called Evolution 3GS ("Evolution"). Evolution fiber had a "U" shape (*i.e.*, a

central spine with curved wings on either side) and a softer, more grass-like texture.

35.

Gilman learned about Mattex's new monofilament fiber at a European Turf Show held in Cologne, Germany from November 5 through November 7, 2003. Jeroen van Balen, then a Managing Director of Mattex, presented Gilman with tufted Evolution samples, which were impressive in their grass-like appearance and which van Balen characterized as stronger than any other fiber on the market.

36.

In 2003, Mattex's monofilament fiber was manufactured in Germany by a company called Reimotec. In 2003, Reimotec used a C8-based linear low density polyethylene polymer ("LLDPE"), described more fully below, and a Masterbatch obtained from BASF Chemical Company ("BASF") to manufacture the monofilament yarn that it supplied to Mattex.

37.

Upon information and belief, the Evolution samples that van Balen provided to Gilman in November 2003 were made with a C8-based LLDPE and a BASF Masterbatch.

17

38.

Impressed by the appearance of the Evolution samples and van Balen's representations about the product's durability, Gilman placed an initial order for Evolution fiber and invited van Balen to FieldTurf's office in Montreal, Canada to discuss the new product.

39.

From 2004 to mid-2005, van Balen and other Mattex representatives made several trips to Montreal to negotiate with FieldTurf over the terms of a possible supply agreement for Evolution yarn. During these meetings, van Balen discussed the advantages of monofilament fiber over the slit-film tape that FieldTurf was using at the time. Van Balen also represented that, during Mattex's preliminary testing, Evolution had proven to be far more durable than other fiber on the market.

40.

On March 22, 2004, Gilman requested that van Balen provide FieldTurf with the results of its preliminary testing. Gilman emphasized the need to see the results of UV testing in particular. To test for UV stability, fiber must be exposed to several thousand hours of constant UV exposure, and then evaluated at the conclusion of that exposure. As a result, there is

no way to discern a fiber's UV stability immediately upon delivery. Gilman advised van Balen that FieldTurf could not commit to any large-scale purchases of Evolution without first having access to Mattex's UV test data.

41.

On July 10, 2004, van Balen sent an e-mail containing specifications for the Evolution fiber to Derek Bearden, then Vice President of Manufacturing at FieldTurf USA's manufacturing plant in Dalton, Georgia. In that e-mail, van Balen discussed the results of UV testing that was designed to evaluate Evolution's durability and colorfastness under prolonged UV exposure. He represented that, after 3,500 hours of UV exposure, Evolution was showing "extremely good results" that were superior to any other fibrillated tape product on the market. Specifically, he noted that Evolution was on target for "tenacity at over 75% after 5000 hours without loss of color."

42.

"Tenacity," also known as "tensile strength," is the maximum tension (force) that a fiber can withstand without tearing per unit of mass. Though tensile strength is properly expressed as breaking force per unit of mass, the term is often used loosely to refer to a product's breaking force.

43.

Under applicable industry standards, artificial grass fibers are expected to retain a tensile strength of over 50% after 3,000 hours of UV exposure. As van Balen intended, FieldTurf understood the test results that he communicated to mean that Evolution was significantly outperforming industry standards.

44.

Mattex communicated similarly strong UV test results to FieldTurf by letter dated March 15, 2005. These results, which van Balen represented to be from an independent scientific laboratory in Germany, indicated that Evolution fiber showed a loss in tensile strength of only 18% after 4,000 hours of UV exposure and confirmed the strong test results previously received from Mattex.

45.

Upon information and belief, the test results that Mattex communicated to FieldTurf were conducted on fiber that was extruded from a C8-based LLDPE and a BASF Masterbatch containing adequate loading levels of UV stabilizers. Upon further information and belief, the tested

fiber was extruded at settings that did not damage the UV stabilizers and that provided the fiber with specific, desirable mechanical properties.

## Results of FieldTurf's Testing of Mattex's Evolution Fiber

46.

In addition to reviewing Mattex's test results, FieldTurf conducted its own series of tests to examine the UV stability and durability of the Evolution fiber.

47.

At all times relevant to the complaint, FieldTurf did not have the ability to perform in-house UV testing. If FieldTurf wished to test a fiber sample for UV stability, it had to outsource the testing to a third party and await the results which, because of the length of time required to conduct UV testing, would be received many months later.

48.

In early 2004, FieldTurf arranged for two pieces of the tufted Evolution samples that van Balen had given to Gilman in November 2003 to be sent to Commercial Testing Company ("CTC") in Dalton, Georgia for UV testing. In a report issued on November 8, 2004, CTC indicated that the samples showed negligible or no color change after over 5,000 hours of

21

exposure.  These results were consistent with the UV test results that FieldTurf had received from Mattex.

49.

In addition to the outsourced UV testing, FieldTurf conducted in-house accelerated wear testing on Evolution turf samples.  To perform this testing, FieldTurf constructed a machine called "Mad Max," the main component of which is a large metal wheel with cleats of different treads around its perimeter.  The wheel is attached to a mechanism that makes it roll from one end of a turf sample to another, and then reverse and roll backwards.  The goal of the test is to simulate foot traffic on the sample and assess how many cycles the sample can withstand before showing wear in the form of fibrillation or splitting.

50.

The original Evolution samples that van Balen had provided to Gilman in November 2003 significantly outperformed competitor samples under Mad Max testing.  After 10,000 passes, the Evolution samples showed virtually no wear at all, while the other samples tested showed some degree of fibrillation.  These wear results were outstanding when compared to the

results of FieldTurf's slit-film tape, which typically showed significant
fibrillation at 10,000 passes.

51.

In light of Evolution's performance in the tests conducted by
Mattex, CTC and FieldTurf itself, FieldTurf began using Evolution on a test
basis in 2004, while continuing to negotiate with Mattex over the terms of a
supply agreement.

### Mattex Changes Its Fiber Formula

52.

In or around early 2005, Bearden observed a slight drop in the
performance of Evolution under Mad Max testing. Bearden reported the
observation to van Balen and asked if Mattex had made any changes to
Evolution since it had provided FieldTurf with the initial product samples in
November 2003.

53.

On February 21, 2005, van Balen responded to Bearden by
stating that, apart from a slight increase in the thickness of the Evolution
fiber, Mattex had made no changes to the product. Specifically, van Balen
represented: "[W]e have not changed any setting on [any] machine, not even

23

line speed, and obviously [the] raw materials are identical. We would never do any even marginal change without talking to you." He went on to state that Mattex was performing UV testing on Evolution samples containing two different types of rubber infill and, after 5,000 hours, was "very satisfied" with the results.

54.

Throughout 2005, Mattex continued to assure FieldTurf of the durability and superiority of its Evolution fiber. On February 23, 2005, van Balen informed Gilman that Mattex had sold Evolution fiber to six customers over the last six months with good results. In or around April 2005, van Balen made the same assurances to Bearden, again stating that, apart from a slight increase in thickness, Mattex had made no changes to the chemical makeup or manufacturing of the Evolution fiber.

55.

Information concerning the chemical composition of Evolution (including the Masterbatch formula and UV stabilizer package added to its polymer base) and the process used to manufacture the fiber was solely within the possession of Mattex. FieldTurf thus accepted as true van Balen's

assurances that Mattex had made no changes to Evolution since November 2003, when it supplied FieldTurf with the first product samples.

56.

        As set forth more fully below, these representations were false. Upon information and belief, Mattex at some point changed its polymer recipe for Evolution fiber from the superior C8-based LLDPE to a less expensive and inferior LLDPE.  Upon information and belief, Mattex also significantly changed the settings used in the extrusion process for Evolution, further diminishing the fiber's quality.  In addition, Mattex switched the Masterbatch formula for Evolution – buying the Masterbatch from a company other than BASF – and stopped providing the Evolution fiber with either the necessary type, quantity or dispersion of UV stabilizers required for the fiber to maintain its strength under prolonged UV exposure.

57.

        Upon information and belief, Mattex intentionally concealed these facts from FieldTurf for the purpose of encouraging FieldTurf to enter into a supply agreement with Mattex in reliance on its earlier assurances.

## The 2005 Supply Agreement and Warranty

58.

On September 10, 2005, in reliance on Mattex's misrepresentations and omissions, FieldTurf entered into a supply agreement with Mattex (the "2005 Supply Agreement"). Under the 2005 Supply Agreement, attached hereto as Exhibit A, FieldTurf agreed to purchase monofilament fiber from Mattex during the period October 1, 2005 through December 31, 2006. Mattex, in turn, granted FieldTurf full exclusivity on the purchase of Evolution fiber for the duration of the contract period.

59.

Paragraph 6 of the 2005 Supply Agreement indicated that all monofilament fiber supplied to FieldTurf would meet specifications provided by Mattex.

60.

Paragraph 18 of the 2005 Supply Agreement indicated that Mattex would guarantee the performance of its monofilament fiber in a separate warranty "reflecting excellent wear properties and UV stability."

61.

In accordance with its obligations under paragraph 18 of the 2005 Supply Agreement, Mattex issued a warranty (the "2005 Warranty"), attached hereto as Exhibit B, which guaranteed the performance of its monofilament fiber for periods ranging from six to nine years, depending on the global location of the installation. For fields installed in areas receiving the highest levels of UV exposure, Mattex provided a six-year warranty; for fields installed in areas receiving the lowest levels of UV exposure, Mattex provided a nine-year warranty.

62.

Mattex also provided additional UV test results to support the 2005 Warranty on the Evolution fiber. On November 1, 2005, van Balen sent Jennifer Bennett (then Materials Manager for FieldTurf) results from extensive UV testing performed on Evolution fiber with and without rubber infill. Depending on the color tested, the "untreated" fiber (*i.e.*, fiber without infill) retained 68 to 88% of its tensile strength after 9,000 hours of UV exposure. The "treated" fiber (*i.e.*, fiber with infill) retained 60 to 70% of its tensile strength after 8,000 hours of UV exposure, which van Balen

noted was equivalent to "5 to 6 years in the Sudan." He characterized this result as "really good when benchmarked."

63.

At no time during the contract period did Mattex disclose to FieldTurf that its polymer recipe for the Evolution fiber had changed from a C8-based LLDPE to a cheaper and inferior LLDPE. Nor did Mattex ever disclose that it had made changes to its extrusion process, switched its Masterbatch provider and failed to add the appropriate levels of UV stabilizers to the Evolution fiber.

## The 2006 Supply Agreement and Warranty

64.

On November 29, 2006, still unaware that Mattex had changed Evolution's chemical composition and extrusion process and in reliance on Mattex's continued representations and omissions concerning the durability and UV stability of the fiber, FieldTurf renewed its supply agreement with Mattex and executed a second agreement for the period December 1, 2006 through December 31, 2007 (the "2006 Supply Agreement"). Under the 2006 Supply Agreement, attached hereto as Exhibit C, FieldTurf agreed to purchase a minimum quantity of monofilament fiber over the contract

period.   Mattex, in turn, granted FieldTurf full exclusivity on the purchase

of Evolution fiber.

65.

Like the 2005 Supply Agreement, the 2006 Supply Agreement

warranted that the Evolution fiber supplied to FieldTurf would meet

Mattex's current specifications.

66.

Paragraph 11 of the 2006 Supply Agreement incorporated the

"MLI [Mattex] Limited Warranty Version 1 – June 2006" (the "2006

Warranty") as an integral part of the contract.  Like the 2005 Warranty, the

2006 Warranty guaranteed the performance of the Evolution fiber for

periods ranging from six to nine years, depending on the global location of

the installation.  For fields installed in areas receiving the highest levels of

UV exposure, Mattex provided a six-year warranty; for fields installed in

areas receiving the lowest levels of UV exposure, Mattex provided a nine-

year warranty.  The 2006 Warranty is attached hereto as Exhibit D.

67.

The 2006 Warranty provided that the Evolution fiber supplied

under the 2006 Supply Agreement would be "free from defects in material

29

and workmanship under normal use" and would maintain its specified tensile strength for the duration of the applicable warranty period. The Warranty indicated that tensile strength would be "deemed maintained" if the fiber's strength did not decrease by more than 50% during the warranty period.

68.

At no time prior to or during the contract period did Mattex disclose to FieldTurf that its polymer recipe for the Evolution fiber had changed from a C8-based LLDPE to a cheaper and inferior LLDPE. Nor did Mattex ever disclose that it had made changes to its extrusion process, switched its Masterbatch provider and failed to add the appropriate levels of UV stabilizers to the Evolution fiber.

69.

Upon information and belief, Mattex intentionally concealed these facts from FieldTurf for the purpose of encouraging FieldTurf to enter into the 2006 Supply Agreement in reliance on its earlier assurances.

70.

Indeed, on December 10, 2006, van Balen again assured Gilman that Mattex "never changed" its polymer formula for the Evolution

fiber.  Van Balen acknowledged that Mattex was testing new products with other purchasers, but insisted that it had never changed the Evolution fiber that it was supplying to FieldTurf.  In addition, van Balen reiterated that "all tests and customers" agreed that Mattex's "standard" polymer was superior to that used by its competitors.

### TenCate Acquires the Assets and Liabilities of Mattex

71.

On or around February 12, 2007, Royal TenCate N.V., the ultimate parent of the TenCate entities, acquired the assets and liabilities of Mattex and formed a new company, TenCate Middle East, to carry out Mattex's activities.

72.

Upon information and belief, with the exception of its general manager, Mattex's entire management team – including van Balen – remained with TenCate following the acquisition.

73.

After the acquisition, TenCate Middle East purported to carry out Mattex's obligations under the 2006 Supply Agreement and Warranty

and continued to supply FieldTurf with the Evolution yarn covered by those agreements.

74.

On April 4, 2007, FieldTurf and TenCate Middle East executed an amendment to the 2006 Supply Agreement in order to increase the prices that TenCate Middle East could charge for supplying monofilament fiber to FieldTurf over the remainder of the contract period. On April 11, 2007, FieldTurf and TenCate Middle East executed a second amendment that further modified those prices. All other terms of the 2006 Supply Agreement remained in effect following TenCate's acquisition of Mattex. The April 4 and April 11, 2007 amendments to the 2006 Supply Agreement are attached hereto as Exhibits E and F, respectively.

**The 2008 Supply Agreement and Warranty**

75.

On July 1, 2008, FieldTurf and TenCate executed a new supply agreement (the "2008 Supply Agreement"), which was scheduled to terminate on December 31, 2011. The 2008 Supply Agreement is attached hereto as Exhibit G.

76.

On November 4, 2009, TenCate provided FieldTurf with notice of its intention to terminate the 2008 Supply Agreement as of June 15, 2011. TenCate remained obligated to supply FieldTurf through and including that date. As set forth more fully below, TenCate now has purported to terminate the 2008 Supply Agreement as of March 2, 2011.

77.

Under the 2008 Supply Agreement, FieldTurf committed to purchase 100% of its fiber needs from TenCate, which in turn committed to supply 100% of FieldTurf's fiber needs. Among the products covered by the 2008 Supply Agreement were not only Evolution – the product that has resulted in more than 100 field failures – but Evolution Plus (an improved version of Evolution), a slit-film tape product called Tapeslide XP Pro ("XP Pro"), other products used for landscaping projects and golf courses, and the fabric backing into which the artificial grass products are tufted.

78.

In Section VII of the 2008 Supply Agreement, TenCate made various representations about the quality of the fiber that it would supply to FieldTurf. In Section VII.A, TenCate warranted that each and every product

shipped to FieldTurf would meet TenCate's product specifications and satisfy TenCate's performance criteria, within certain acceptable ranges.

79.

Section VII.C of the 2008 Supply Agreement set forth a limited warranty (the "2008 Warranty") applicable to the fiber supplied by TenCate. The 2008 Warranty provided that, under normal conditions during the applicable warranty period, TenCate's products would "maintain their UV stability and tensile strength." Like the 2006 Warranty, the 2008 Warranty indicated that a product would be deemed to have maintained its UV stability and tensile strength if the original tensile strength of the product did not decrease by more than 50% during the warranty period. The 2008 Warranty further provided that each and every product would be "free from visual defects and defects in materials and workmanship" and would not "fade or change color beyond the extent permitted in the Product Specifications."

80.

TenCate's default product specifications and performance criteria for Evolution were attached as Schedule B to the 2008 Supply Agreement. With respect to tensile strength, the product specifications

34

indicated that each strand of Evolution fiber should have a "typical" breaking force of 115 newtons (for tensile strength of 25.9 lbs per strand) and a minimum breaking force of 95 newtons (for tensile strength of 21.4 lbs per strand). Each strand of fiber is comprised of six filaments. Thus, under the applicable product specifications, the tensile strength for each filament should range from 4.3 to 3.6 lbs/ filament. The 2008 Warranty guaranteed that the fiber would retain 50% of this range – or 2.2 to 1.8 lbs/filament – during the applicable warranty period.

81.

The applicable warranty period was set forth in Exhibit A to the 2008 Supply Agreement, which provided a warranty ranging from eight to eleven years depending on the particular fiber supplied and the geographic location of the product's installation. For fields installed in areas receiving the highest levels of UV exposure, TenCate provided an eight-year warranty; for fields installed in areas receiving the lowest levels of UV exposure, TenCate provided an eleven-year warranty.

82.

Section II.C of the 2008 Supply Agreement provided:

"Termination of this Agreement at any time for whatever reason shall not

35

affect any performance obligation accruing or arising before or as a result of such termination."

### FieldTurf Discovers that Certain North American Fields Manufactured with Evolution Fiber Are Failing

83.

FieldTurf marketed the fields that it manufactured with Evolution fiber provided by Mattex and TenCate under the brand names "FieldTurf," "Duraspine" and "Prestige." The FieldTurf and Duraspine brands were used primarily in North America, while the Prestige brand was used primarily in Europe.

84.

FieldTurf provided its customers with warranties (the "FieldTurf Warranties") for the fields that it manufactured. In North America, nearly all of the applicable warranties were for eight-year periods.

85.

Over the course of 2009 and 2010, FieldTurf received complaints from a significant number of customers in North America who had purchased FieldTurf, Duraspine and Prestige fields manufactured with Evolution fiber. Some customers reported that the fibers on their fields were splitting and shedding during routine use (*e.g.*, covering player uniforms

during sports games and practices).  Other customers reported excessive

thinning and fading of the fibers – especially along white and yellow lines,

logos and other field areas composed of colored yarn.   Still other customers

reported that large areas of their fields in all colors had degraded

dramatically.

86.

In many instances, customers complained that fiber in one

tufted row of a field was failing, while fiber of the same color in an

immediately adjacent tufted row was not failing.  The existence of variable

degradation rates in fiber exposed to the same environmental and wear

conditions suggested, at a minimum, that the Evolution fiber supplied by

Mattex and TenCate was not performing in a uniform manner.  Upon

information and belief, such a marked variability in performance means that

Mattex and TenCate had quality control issues in their extrusion processes

that resulted in alterations to what should have been chemically

indistinguishable fibers.

## FieldTurf Reports Complaints of Fiber Defects to TenCate

87.

FieldTurf contacted TenCate to report the customer complaints that it received. Over the course of 2009 and 2010, FieldTurf representatives including Howard McNeil (Senior Vice President of Operations) and Brian Waters (Director of Logistic and Purchasing) reported customer complaints to TenCate representatives including Guido Vliegen (Commercial Director, TenCate Grass), Ian Pietri (Vice President of Sales, TenCate Grass), Rob Black (Vice President of Logistics, TenCate Grass), Mario Muehle (Research and Development Director, TenCate Grass) and Mike Green (Technical Service Manager, TenCate Grass).

88.

In mid-2010, McNeil and Waters established weekly telephone conferences and monthly in-person meetings to address the quality and production issues associated with the fiber supplied by TenCate. Customer complaints were regularly discussed during these telephone conferences and meetings.

89.

Following a customer complaint, FieldTurf typically scheduled a field inspection to investigate the customer's concerns. FieldTurf typically invited TenCate to attend these inspections, and often coordinated with TenCate to schedule them.

90.

Green regularly attended field inspections on behalf of TenCate during 2009 and 2010. Waters typically attended the inspections on behalf of FieldTurf.

91.

During the field inspections, both FieldTurf and TenCate photographed the field areas giving rise to the customer complaint. On such visits, TenCate generally had the opportunity to take physical samples from the fields that it inspected and, in some cases, collected samples of loose fiber from those fields.

92.

At the outset of the first few field inspections, Green stated to Waters that he would not comment upon any suspected reasons for the fiber failures. Nonetheless, Green acknowledged numerous fiber failures in the

field inspection reports that he prepared following each site visit. Numerous of Green's reports acknowledged the "splitting and breaking off" of fiber, particularly the white and yellow fiber on field lines. Green's reports offered no explanation for the defects, though he sometimes noted the similarity of defects across fields. For example, in a field inspection report following a visit to a stadium in Miami, Florida, Green observed the splitting and breaking off of white and yellow fibers and wrote: "No explanation for this, but it has been seen before in other fields."

93.

FieldTurf has provided TenCate with prompt notice of customer warranty claims.

94.

TenCate has failed to take any steps to replace or repair the defective fiber in any of the fields that it has inspected and/or for which it has received notice of a warranty claim.

95.

The breaking, splitting, thinning and overall deterioration of the Evolution fiber in a number of the FieldTurf, Duraspine and Prestige fields demonstrates that, in many cases, the fiber is not retaining its tensile strength

or UV stability as required by the 2005, 2006 and 2008 Supply Agreements (collectively, the "Supply Agreements") and as guaranteed by the 2005, 2006 and 2008 Warranties (collectively, the "Warranties").

**FieldTurf Investigates Nature and Cause of Fiber Failure**

96.

With TenCate unwilling to answer its questions about the reasons for Evolution's premature failure, FieldTurf engaged experts to perform testing of fiber samples from a number of the fields experiencing fiber degradation.

97.

This testing revealed that certain lots of the Evolution fiber supplied to FieldTurf for inclusion in its FieldTurf, Duraspine and Prestige fields exhibited premature and significant signs of both physical and chemical degradation.

98.

This testing further revealed that, where there is premature degradation, it has at least two causes: (1) some portion of the Evolution fiber supplied to FieldTurf from 2005 through the present was created from a cheaper and inferior LLDPE, as opposed the superior, C8-based LLDPE

used to create the original Evolution samples provided to FieldTurf in

November 2003; and (2) some portion of the Evolution fiber supplied to

FieldTurf from 2005 through the present contained either insufficient

loading levels of UV stabilizers, or the wrong types of UV stabilizers, to

protect the fibers from deterioration in prolonged exposure to UV radiation.

### A. Expert Testing Reveals that Degraded Evolution Fiber Was Made from a C4 Polymer

99.

The LLDPE used to make artificial grass fiber can be one of

three types: C8, C6 or C4. The letter-number combinations refer to the

number of carbon atoms linked together in the hydrocarbon molecule that

forms the polymer. Accordingly, fiber that is made with a "C8" LLDPE

contains 8 carbon atoms and 16 hydrogen atoms; by contrast, fiber made

with a "C4" LLDPE contains only 4 carbon atoms and 8 hydrogen atoms.

100.

A C8-based LLDPE is stronger than a C4-based LLDPE

because the molecules are larger and less volatile. It is common knowledge

in the artificial grass industry that a C8-based LLDPE produces the strongest

and most resilient artificial grass fibers.

42

101.

One of the ways in which a C8-based LLDPE is stronger than a C4-based LLDPE is in its thermal stability. The larger, less volatile molecules in a C8-based LLDPE have lower "shrinkage rates" when exposed to heat as compared to smaller, more volatile molecules, which bend and kink under prolonged heat exposure.

102.

Because a C8-based LLDPE produces the most durable and thermal resistant artificial grass fiber, it is also the most expensive. C8-based LLDPE sells for approximately 1.56€/kg. C4-based LLDPE is considerably cheaper, selling for 1.33€/kg. C4-based LLDPE is even less expensive in Saudi Arabia, where it is abundantly available for little or no shipping cost.

103.

Expert testing on degraded Evolution samples confirmed that the fiber from those samples was manufactured from a C4-based LLDPE. Expert testing on degraded Evolutions samples also found very high and inconsistent shrinkage rates, which reflected the poor thermal stability of the fiber.

104.

Upon information and belief, the original Evolution samples provided to FieldTurf in November 2003 were manufactured from the more resilient C8-based LLDPE.

105.

Upon information and belief, at some point unknown to FieldTurf, Mattex and later TenCate began using an inferior LLDPE to manufacture Evolution fiber in order to decrease costs and increase profits.

106.

The shift from a C8-based LLDPE to a cheaper, inferior LLDPE weakened the matrix of the Evolution fiber by, among other things, increasing the fiber's shrinkage rate. This weaker matrix has contributed to the product's premature degradation, especially in high temperature, high UV installations.

**B.    Expert Testing Reveals that the Degraded Evolution Fiber Contained Inadequate UV Protection**

107.

Adequate UV protection is essential to the long-term durability of any artificial grass fiber. Typically, stabilizer packages for polyethylene fibers have three components that protect the fibers from degradation: (1)

primary antioxidants; (2) secondary antioxidants; and (3) UV stabilizers (*i.e.*, hindered amine light stabilizers ("HALS")) and UV absorbers. HALS are a particularly important aspect of the stabilizer package. Without HALS in a LLDPE fiber matrix, the fiber will not have any protection from the sun's harmful UV rays. The use of antioxidants alone, without HALS, is inadequate to protect fiber from UV radiation.

108.

Experts performed a number of different tests on degraded Evolution samples, all of which indicated that the samples had inadequate levels of UV protection. In one scenario, experts performed a battery of tests on exposed, degraded fiber from one field and unexposed, "retain" fiber from a second field to determine if there were differences in the UV protection applied to each.[2] The tests detected no commonly known HALS in the fiber samples from either field. In addition, the tests detected different types and levels of antioxidants in the fiber samples from each field.

---

[2] "Retain" or "virgin" fiber is that leftover from the manufacture of a given field and stored or "retained" by FieldTurf.

45

109.

In a second scenario, experts found varying levels of HALS byproducts in different performing fiber sampled from adjacent areas of a single field.  Fiber that had not yet degraded contained three times more HALS byproducts than fiber from the same field that already had degraded. This result indicated that HALS were present in varying quantities in the fiber supplied by TenCate for the field's construction, and explained why fibers from a single field were performing differently under the exact same environmental conditions.

110.

In a third scenario, experts identified the particular type and concentration of HALS present in differently performing fiber from a single field. Experts concluded that the fiber in the tested field contained uncommon HALS and at varying concentrations.  Fiber that had not yet degraded contained 10,000 parts per million ("ppm") of the uncommon HALS, while fiber that already had degraded contained 5,000 ppm of the uncommon HALS.   A typical HALS concentration is 8,000 to 10,000 ppm. The inadequate HALS concentration found in the degraded fiber explained why it had failed more quickly than other fiber from the same field.

111.

Together, these results prove that at least certain lots of the Evolution fiber contain inadequate UV protection, which is causing those lots to fail long prior to the expiration of the Warranties. The variation in the degradation of fiber samples from the same fields, exposed to the same environmental conditions, is clear evidence of inconsistent fiber quality.

**FieldTurf Testing Shows that Degraded Evolution Fiber
Exhibits a More than 50% Reduction in Tensile Strength**

112.

Under the terms of the 2006 and 2008 Warranties, a product is deemed to have maintained its UV stability if its tensile strength does not decrease by more than 50%. Using a newly developed technique to test degraded fiber samples, FieldTurf has confirmed that degraded Evolution fiber does not meet this standard.

113.

As previously noted, TenCate specified the tensile strength of Evolution fiber at a minimum of 3.6 lbs/ filament. Recent testing of degraded fibers from one failing field revealed an average tensile strength of 0.5 lbs/ filament – a reduction far in excess of 50%.

114.

The test results observed by FieldTurf and its experts, together with the number of fields that are failing, demonstrates that, in many cases, Evolution is chemically and physically degrading and not retaining its tensile strength or UV stability as represented to FieldTurf, as required by the Supply Agreements, and as guaranteed by the Warranties.

### FieldTurf Discovers "Streaking" Defect in Certain European Fields Manufactured With Evolution Fiber

115.

In 2009 and 2010, in addition to observing the above-described defects in a number of its FieldTurf, Duraspine and Prestige fields in North America, FieldTurf began to observe a visual "streaking" defect in a number of European fields manufactured with Evolution fiber.

116.

"Streaking" refers to color variation in a field due to different degrees of fiber relaxation. Fiber in one row stands up, while fiber in an adjacent row lies flat. The inconsistent relaxation causes differences in the reflection of light off of the fiber, and results in the field having a "streaked" or "striped" appearance.

117.

The streaking typically manifests in the weeks or months after a field's installation and worsens over time. Certain customers who have experienced the streaking defect have demanded the full replacement of their fields under their FieldTurf Warranties. Some have threatened litigation.

118.

Where a customer experiencing the streaking defect has asserted a warranty claim against FieldTurf, FieldTurf has provided TenCate with prompt notice of such claim.

119.

Indeed, FieldTurf reported the streaking defect to TenCate soon after it began to receive complaints of the problem. In or around February 2009, Ralph Jorissen (Vice President, FieldTurf Tarkett SAS) reported defects observed in several fields in Italy to Mario Muehle (Research and Development Director, TenCate Grass) and Tom Algoet (Sales Manager, TenCate Grass) and invited them to participate in inspections of those fields. Those inspections took place in March 2009.

120.

In or around Summer 2009, Muehle participated in inspections of several Dutch fields with Jorissen and Teun Wouters from CSC Celeen, FieldTurf's distribution and installation partner in the Netherlands. Muehle conducted a second round of field inspections in the Netherlands with Jorissen and Wouters in September 2010. Muehle also has participated in field inspections elsewhere in Europe, including France, Switzerland and Italy.

121.

In November 2010, FieldTurf delivered to Muehle and Algoet a written presentation which, among other things, described in detail the streaking defect observed in six Dutch fields manufactured with Evolution fiber. In the presentation, FieldTurf requested a meeting with TenCate to discuss the causes of the defect and the corrective measures that could be taken by TenCate. FieldTurf also advised Muehle and Algoet of recent complaints of streaking received from customers in France.

122.

In February 2011, Jorissen sent Muehle and Algoet an e-mail following up on his request for a meeting to discuss the extent of the

streaking problem and emphasizing the need to resolve the issue quickly in order to avoid litigation by a number of FieldTurf customers. Jorissen received no response to this e-mail.

123.

TenCate has failed to take any steps to replace or repair the defective fiber in any of the fields that it has inspected and/or for which it has received notice of a warranty claim.

124.

The streaking observed in European fields manufactured with Evolution fiber demonstrates that, in many cases, the fiber is not free from visual defects and defects in materials and workmanship, as required by the 2008 Warranty.

125.

The failure of Evolution to perform for the time periods set forth in the Warranties has subjected FieldTurf to considerable exposure under the FieldTurf Warranties of the same duration. FieldTurf already has spent approximately $4 million performing replacements and repairs of FieldTurf, Duraspine and Prestige fields under the terms of its warranties and faces pending and future claims of tens of millions of dollars.

51

126.

In addition, the failure of a number of Durapsine and Prestige fields has caused significant damage to FieldTurf's reputation. Numerous customers have expressed disappointment and anger over the discovery that their fields are failing prematurely, and some have threatened litigation. FieldTurf risks losing the business of these customers, as well as overall damage to its reputation, unless it performs repairs and replacements which, to the extent they are necessary, are the direct result of the defects in the Evolution fiber supplied by Mattex and TenCate.

**TenCate Wrongfully Terminates the 2008 Supply Agreement**

127.

In November 2010, FieldTurf advised TenCate of its intention to assert claims arising from its supply of defective fiber and, in an effort to avoid litigation, initiated settlement discussions with TenCate.

128.

The parties scheduled a settlement meeting for January 12, 2011 in Atlanta, Georgia. In advance of that date, FieldTurf provided TenCate with specific information concerning the fields exhibiting

premature fiber degradation and with a summary of the test results that it had conducted on degraded fiber samples.

129.

The parties were forced to postpone the settlement meeting due to extreme weather conditions in Atlanta and along the East Coast. FieldTurf made repeated efforts to reschedule the meeting, but those efforts were ignored by TenCate which, having requested and received substantial information concerning field failures and the results of FieldTurf's testing and analysis, advised FieldTurf that it no longer wished to meet.

130.

On February 18, 2011, TenCate notified FieldTurf of its intention to terminate the 2008 Supply Agreement on March 2, 2011, due to purported breaches of the Agreement by FieldTurf. TenCate further notified FieldTurf that it would not supply it with any fiber after the purported termination date.

## TenCate's Refusal to Fill Existing
## Orders Will Irreparably Harm FieldTurf

131.

As previously noted, Section II.C of the 2008 Supply Agreement specifically provides: "Termination of this Agreement at any

time for whatever reason shall not affect any performance obligation accruing or arising before or as a result of such termination."

132.

On February 24, 2011, in accordance with Section II.C of the Supply Agreement, FieldTurf requested commercially reasonable assurances that TenCate honor orders for fiber placed prior to the purported March 2, 2011 termination date.  The orders that FieldTurf demanded that TenCate honor are not for Evolution fiber, but for other products which TenCate is obligated to supply to FieldTurf – as its sole source supplier – under the 2008 Supply Agreement and which, to FieldTurf's knowledge, are not defective.  The products that are the subject of the unfilled orders include Evolution Plus, XP Pro, other unique products that FieldTurf uses to complete landscaping projects and golf courses, and the fabric backing into which the artificial grass products are tufted (collectively, the "TenCate Products" or "Products").

133.

Since approximately August 2011, FieldTurf has reported its needs for the TenCate Products in weekly forecast reports, which were discussed in detail during weekly (and sometimes biweekly or daily)

conference calls with TenCate.  Under the 2008 Supply Agreement, TenCate is required to supply FieldTurf for up to six months and no less than two months of its forecasted needs.

134.

Upon information and belief, since approximately August 2010, TenCate has experienced significant delays in its manufacturing of certain products, including XP Pro.  Many of FieldTurf's unfilled orders are for TenCate Products that it has needed for specific projects since that time.

135.

TenCate has failed to give FieldTurf the requested assurances that it will fill pre-existing orders for the TenCate Products.

136.

The pending but unfilled orders from FieldTurf's manufacturing plant in Auchel, France include the following:

| Product | Quantity | Color | Purchase Order No. |
|---|---|---|---|
| XP Pro | 106,400 kg | Multiple colors | 4500088789 |
| Evolution Plus | 100,000 kg | Field green/ Olive green | 4500090037 |

55

137.

The pending but unfilled orders placed from FieldTurf's manufacturing plant in Calhoun, Georgia include the following:

| Product | Quantity | Color | Purchase Order No. |
|---------|----------|-------|---------------------|
| XP Pro | 1,323,000 lbs | Multiple colors | 47501, 47502, 47731, 47730, 47732 |
| LSR 10050 | 60,000 lbs | Field green | 47823 |
| F7600 | 100,000 lbs | Putting green | 47823 |
| Backing | 181,390 yards | Black | 47677 |

138.

FieldTurf needs the TenCate Products that are the subject of the unfilled orders to meet its obligations to customers under at least 19 contracts and/or letters of intent in North America and a number of other contracts in Europe. Among them is a contract for the construction of three multi-sport use fields for use by the University of Pennsylvania ("Penn"). These fields are part of the Penn Park project, which is a $30 million effort to develop a 24-acre parcel of land that will connect Penn to the City of Philadelphia. The Penn Park contract specifies that the recreational area must be built with XP Pro.

139.

No readily available alternates for the TenCate Products currently exist in the market place. Evolution Plus, XP Pro and the other artificial grass products supplied by TenCate are unique products that FieldTurf cannot obtain from alternate fiber suppliers. Indeed, Evolution Plus is a product manufactured by TenCate *exclusively* for FieldTurf. With respect to the fabric backing, though there are alternative suppliers in the market, there are none that are currently able to supply FieldTurf with backing of sufficient quantity and quality to meet its needs, which are substantial.

140.

If TenCate refuses to supply the TenCate Products to FieldTurf, FieldTurf will be unable to satisfy its obligations to customers who already have contracted for fields manufactured with the Products. These customers could commence legal proceedings against FieldTurf, refuse to do business with FieldTurf in the future and report FieldTurf's default to potential future customers causing irreparable damage to FieldTurf's business and reputation.

141.

A refusal by TenCate to fill FieldTurf's existing orders for the TenCate Products therefore will cause FieldTurf irreparable damage to its business and reputation in the marketplace.

142.

Money damages are inadequate to compensate FieldTurf for the damage to its goodwill and reputation that will result from TenCate's breach of contract.

143.

Section XIV.H of the 2008 Supply Agreement recognizes the irreparable injury that will be occasioned by TenCate's misconduct and specifically authorizes the award of a preliminary and/or permanent injunction to compel TenCate's specific performance of its contractual obligations to FieldTurf. Specifically, Section XIV.H provides:

> The parties acknowledge and agree that irreparable injury will result from a breach of any provision of this Agreement, and money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or a threatened breach of one or more of the provisions of this Agreement, either party (in addition to any other remedies which may be available to it) shall be entitled to one or more preliminary or permanent injunctions … compelling the

58

performance of any obligation which, if not
performed, would constitute a breach.

### **FIRST CLAIM FOR RELIEF**
### **(FRAUDULENT INDUCEMENT)**
### **(Against TenCate Middle East)**

144.

FieldTurf repeats and realleges, as if set forth fully herein, the

allegations of all of paragraphs 1-5 and 10-126 of this complaint.

145.

Mattex, and later TenCate Middle East, knowingly and

intentionally misrepresented the quality of Evolution fiber to FieldTurf in

order to induce FieldTurf into executing the 2005 and 2006 Supply

Agreements.

146.

As set forth more fully above, Mattex provided FieldTurf with

Evolution samples created from a C8-based LLDPE and falsely assured

Field Turf that the fiber it would supply under a contract with FieldTurf

would be of the same chemical composition and quality as the fiber

contained in the samples.  These representations were false when made, and

designed to and did induce FieldTurf into entering into contracts with

Mattex.

59

147.

In addition, Mattex provided FieldTurf with test results that purported to reflect the excellent wear resistance and UV stability of Evolution fiber.  Upon information and belief, these tests were performed on Evolution samples created from a C8-based LLDPE, and were designed to and did induce FieldTurf into entering into a contract with Mattex.

148.

FieldTurf executed the 2005 and 2006 Supply Agreements with Mattex in reliance on Mattex's false representations that the fiber it was supplying was of the same chemical composition and quality as the fiber contained in the original product samples that it had received and tested, and in further reliance on Mattex's representations concerning the fiber's wear resistance and UV stability.

149.

Upon information and belief, at some point unknown to FieldTurf, Mattex switched the formula that it used to create Evolution from a C8-based LLDPE to a cheaper and inferior LLDPE.   Upon information and belief, Mattex also made changes to Evolution's manufacturing process. At some point also unknown to FieldTurf, Mattex stopped adding the UV

stabilizers necessary for UV protection to the Evolution polymer matrix. Mattex knew or should have known that these material changes rendered Evolution fiber less durable and unable to withstand prolonged UV exposure.

150.

At no time did Mattex disclose these material changes to the Evolution product to FieldTurf. Rather, Mattex intentionally concealed these changes for the purpose of encouraging FieldTurf to enter into the 2005 and 2006 Supply Agreements.

151.

Had FieldTurf known that the Evolution fiber that Mattex intended to provide under the 2005 and 2006 Supply Agreements would be inferior to the Evolution product samples it originally had received and tested, it would not have entered into the agreements and would not have manufactured its fields with the defective fiber that it received under such agreements.

61

152.

FieldTurf has sustained damages in an amount to be determined at trial but believed to be in excess of $30 million as a direct and proximate consequence of Mattex's misrepresentations and omissions.

## SECOND CLAIM FOR RELIEF
### (BREACH OF CONTRACT)
### (Against All Defendants)

153.

FieldTurf repeats and realleges, as if set forth fully herein, the allegations of paragraphs 1 through 143 of this complaint.

154.

The Supply Agreements imposed upon Mattex and TenCate a duty of good faith in performance.

155.

The Supply Agreements further obligated Mattex and TenCate to supply FieldTurf with Evolution fiber that maintained its UV stability and tensile strength, as set forth in product specifications.

156.

TenCate specified the tensile strength of Evolution fiber at a minimum of 3.6 lbs/ filament, and provided that the fiber would be deemed

to have maintained its UV stability if it retained 50% of its tensile strength during the applicable warranty period.

157.

Mattex and TenCate breached the Supply Agreements and the duty of good faith in performance contained therein by supplying FieldTurf with defective Evolution fiber that has not maintained its UV stability and tensile strength, as evidenced both by the failure of certain fields manufactured with Evolution fiber and the results of testing that FieldTurf and its experts have performed on fiber from those failing fields.

158.

TenCate has further breached the 2008 Supply Agreement by wrongfully terminating the Agreement and refusing to fill FieldTurf's pending orders for the TenCate Products in light of such termination.

159.

As a direct and proximate consequence of these breaches, FieldTurf has sustained damages in an amount to be determined at trial but in all events in excess of $30 million.

## THIRD CLAIM FOR RELIEF
## (BREACH OF EXPRESS WARRANTY)
### (Against All Defendants)

160.

FieldTurf repeats and realleges, as if set forth fully herein, the allegations of paragraphs 1-5 and 11-126 of this complaint.

161.

The Warranties guaranteed that the Evolution fiber supplied to FieldTurf would maintain its UV stability and tensile strength for a period of six to nine years, depending on the geographic location of the installation. The 2008 Warranty further guaranteed that the Evolution fiber supplied to FieldTurf would be free from visual defects and defects in materials and workmanship.

162.

The 2006 and 2008 Warranties indicate that a product will be deemed to have maintained its UV stability and tensile strength if the original tensile strength of the product does not decrease by more than 50% during the warranty period.

163.

Mattex and TenCate breached the Warranties by supplying FieldTurf with defective Evolution fiber that has not maintained its UV stability and tensile strength, as evidenced both by the failure of certain fields manufactured with Evolution fiber and the results of testing that FieldTurf and its experts have performed on fiber from those failing fields.

164.

TenCate further breached the 2008 Warranty by supplying FieldTurf was Evolution fiber that has exhibited visual defects which, upon information and belief, are the result of defects in TenCate's manufacturing process.

165.

As a direct and proximate consequence of these breaches, FieldTurf has sustained damages in an amount to be determined at trial but in all events in excess of $30 million.

## COUNT FOUR
## (BREACH OF IMPLIED WARRANTIES)
## (Against TenCate Middle East)

166.

FieldTurf repeats and realleges, as if set forth fully herein, the allegations of paragraphs 1-5 and 11-126 of this complaint.

167.

The 2005 Supply Agreement implicitly warranted that the Evolution fiber supplied to FieldTurf would be merchantable in that, among other things, it would (a) be fit for the ordinary purpose for which artificial fiber is used; and (b) be of even kind and quality, within variations permitted by the Agreement.

168.

The 2005 Supply Agreement further implicitly warranted that the Evolution fiber supplied to FieldTurf would be fit for a particular purpose, namely the construction of artificial turf fields.

169.

The 2005 Warranty does not disclaim either of these implied warranties.

170.

Mattex breached the implied warranties by supplying FieldTurf with defective Evolution fiber that has not maintained its UV stability and tensile strength, as evidenced both by the failure of certain fields manufactured with Evolution fiber and the results of testing that FieldTurf and its experts have performed on fiber from those failing fields.

171.

As a direct and proximate consequence of these breaches, FieldTurf has sustained damages in an amount to be determined at trial but in all events in excess of $30 million.

## COUNT FIVE
### (BAD FAITH)
### (Against TenCate Middle East)

172.

FieldTurf repeats and realleges, as if set forth fully herein, the allegations of paragraphs 1 through 143 of this complaint.

173.

Mattex and TenCate Middle East acted in bad faith in making the 2005 and 2006 Supply Agreements and issuing the Warranties for a

product that they knew to be defective, causing FieldTurf unnecessary trouble and expense.

174.

Accordingly, FieldTurf is entitled to recover all attorney's fees and expenses incurred in bringing and prosecuting this action pursuant to O.C.G.A. § 13-6-11.

## COUNT SIX
## (PRELIMINARY AND PERMANENT INJUNCTION)
### (Against All Defendants)

175.

FieldTurf repeats and realleges, as if set forth fully herein, the allegations of paragraphs 1 through 143 of this complaint.

176.

FieldTurf will suffer immediate and irreparable harm if TenCate is not directed to fill the orders for TenCate Products that were placed by FieldTurf in advance of the termination of the 2008 Supply Agreement.

177.

FieldTurf seeks a preliminary and permanent injunction compelling TenCate to fill all orders for the TenCate Products.

## CONCLUSION

WHEREFORE, FieldTurf demands a judgment from this Court awarding:

(a)   Compensatory damages in an amount to be determined at trial but believed to be in excess of $30 million;

(b)   On Count 1, punitive damages in an amount to be determined at trial;

(c)   On Count 5, the attorney's fees and costs incurred in prosecuting this action;

(d)   On Count 6, compelling TenCate to fill all orders for XP products placed prior to the Supply Agreement's improper termination on March 2, 2011;

(e)   Interest on any award at the maximum allowable rate; and

(f)   Such other or further relief as this Court deems just and proper.

## JURY DEMAND

FieldTurf further demands a trial by jury of all claims set forth in this complaint that are so triable.

Dated: Atlanta, Georgia
March 1, 2011

Respectfully submitted,

NATIONS, TOMAN & MCKNIGHT LLP

/S/ Charles K. McKnight, Jr.
Charles K. McKnight, Jr.
Georgia Bar No. 495810
Gary J. Toman
Georgia Bar No. 714651
1230 Peachtree Street, NE, Suite 2050
Atlanta, Georgia 30309
(404) 266-2366
cmcknight@ntmlaw.com
gtoman@ntmlaw.com

-and-

FRIEDMAN KAPLAN SEILER &
   ADELMAN LLP
Bruce S. Kaplan (*pro hac vice* app. to follow)
Amy C. Brown (*pro hac vice* app. to follow)
Lindsey R. Skibell (*pro hac vice* app. to follow)
1633 Broadway
New York, NY 10019-6708
(212) 833-1100

Attorneys for Plaintiffs