**Exhibit G**

## SUPPLY AGREEMENT

THIS SUPPLY AGREEMENT ("Agreement") is made as of July 1, 2008 (the "Effective Date"), by and between TenCate Grass North America, an American corporation, Thiolon BV, a Dutch limited liability company, Thiolon TenCate Middle East, a UAE limited liability company (collectively, the "Supplier"), and FieldTurf USA Inc., a Canadian corporation and Fieldturf Tarkett SAS, a French corporation, or any affiliate thereof (collectively, the "Purchaser").

In connection therewith, Purchaser desires to purchase from, and have shipped by, Supplier, Supplier's artificial grass fiber as more specifically described on Schedule A attached hereto and incorporated herein (collectively, and including the Evolution 3GS® product, the "Products"), upon the terms and conditions described below.

In consideration of the promises and mutual covenants of the parties, Supplier and Purchaser hereby agree as follows:

## SECTION I. ORDERS, PURCHASE

A.      Subject to the terms and conditions hereof, Purchaser agrees to purchase from Supplier, and Supplier agrees to sell and supply to Purchaser, 100% of the Purchaser's Product needs for commercial sales, namely polyolefin grass fiber that Purchaser needs for its plants in Dalton (Georgia, USA), Auchel (France) and all other production locations where Purchaser will produce its artificial grass products. Purchaser will notify Supplier of such other production locations from time to time. The Products and the specifications for the Products (the "Specifications") are more fully described in Schedule A, as such may be amended or supplemented in writing from time to time in accordance with the terms of this Agreement.

B.      Commencing on September 15, 2008, Purchaser shall provide to Supplier in writing on Friday of each week during the Term (or the preceding business day, if Friday is not a business day) a weekly forecast, prepared in good faith, for Purchaser's needs for Products for each of the following six (6) months, as calculated on a rolling basis. Such forecasts will be considered estimates only and, except as set forth herein, are not intended to limit Purchaser's rights to purchase Products. Purchaser shall inform Supplier weekly of actual stock levels and inform Supplier in case substantial changes in stocks or forecasted sales occur. Supplier shall sell and ship to Purchaser, and Purchaser shall purchase and accept, Products as required to maintain Purchaser's stock for a minimum of 2 months and a maximum of 6 months, in either case based on Purchaser's six month rolling forecast which will be updated weekly by the Purchaser; provided, however, that in no event will Supplier be required to sell or ship to Purchaser Products required to maintain Purchaser's stock beyond the date of the expiration or termination of this Agreement. Subject to the payment provisions of Section VI, Purchaser shall not reject or refuse payment for Products shipped by Supplier in accordance with the foregoing, except during the continuance of any material non-compliance by Supplier with its obligations under the Agreement. Notwithstanding the foregoing, Supplier shall not be deemed to have breached any term of this Agreement in the event that Purchaser's requirements for the Products in any given period materially exceed Purchaser's forecast for such period (as given two months prior) and Supplier is unable to meet such requirements.

## SECTION II. TERM & TERMINATION

A.      TERM. This Agreement shall commence on the Effective Date and shall remain in full force and effect through and including December 31, 2011 (the "Initial Term"), and shall automatically be renewed for an additional twelve-month period ("Renewal Period") unless terminated by any party by providing written notice to the other no less than eighteen (18) months before the end of the Initial Term (the "Term").

1

B.    EARLY TERMINATION.

1. TERMINATION BY PURCHASER.

1.1.    Purchaser shall promptly notify Supplier upon receipt by Purchaser of an offer by any third party to sell a product that Purchaser considers superior to Evolution 3GS or a New Innovative Product that Purchaser has obtained exclusivity on under this agreement. Following the date of such notice, Purchaser may terminate this agreement upon 12 months prior written notice to Supplier; provided, however, that if, prior to the effective date of such termination, Supplier provides Purchaser with a product superior to that offered by such third party, as reasonably determined by Purchaser, then any prior notice of termination under this Section II(B)(1.1) shall be deemed void and without effect.

1.2.    In case cost increases other than raw materials rise significantly, Supplier and Purchaser will discuss the situation and attempt to find an equitable solution. If such a solution is not found, Purchaser may terminate the Agreement by providing twelve (12) months prior written notice to Supplier.

2. TERMINATION BY EITHER PARTY: this Agreement may be terminated by registered mail:

2.1    By either Party, with immediate effect, upon the insolvency of the other Party or any action causing such other Party to avail itself of laws for the protection of debtors, including, without limitation, the appointment of a receiver or the like, a complete or partial moratorium on payment of debt, a petition in bankruptcy or the like filed by or against such other Party, or an assignment of all or any portion of the assets of such other Party for the benefit of its creditors.

2.2.    By either Party if the other Party fails to perform in accordance with the terms of this agreement in any material respect and such default has not been remedied within 30 days after receiving written notice specifying the nature of the breach or default to the failing Party.

2.3.    This Agreement may be terminated by either party at any time, for any reason or no reason, by providing an eighteen (18) months prior written notice.

C.    CONSEQUENCES OF TERMINATION

Termination of this Agreement at any time and for whatever reason shall not affect any performance obligation accruing or arising before or as a result of such termination.

Upon termination of this agreement at any time, and for whatever reason, the obligation stipulated in Section XI shall survive.

### SECTION III. EXCLUSIVITY

A.    During the term of this Agreement, and subject to Section III(B), Supplier shall not sell, or offer to sell, any Evolution 3GS products to any person or entity other than Purchaser.

B.    To the extent Supplier develops a new innovative turf-related technology relevant to Purchaser's requirements (a "New Innovative Product") Supplier must offer such New Innovative Product to Purchaser on terms and conditions that include a 36-month exclusivity related to such New Innovative Product. In the event that Purchaser elects to agree to the terms offered by Supplier, (i) Supplier shall provide the New Innovative Product on an exclusive basis for a thirty six month period commencing on the date Supplier and Purchaser agree in writing to the pricing terms of

2

8/28/2008

such New Innovative Product, and (ii) the exclusivity conferred by Section III(A) or any exclusivity with respect to a prior New Innovative Product shall lapse and Supplier shall be able to sell Evolution 3GS Products (or prior New Innovative Products) to third parties without restriction after a twelve month period following such new exclusivity. For the avoidance of doubt, the exclusivity provisions of Section III(A) and (B) apply only to one New Innovative Product at any time and Supplier shall not be required to provide to Purchaser more than one New Innovative Product on an exclusive basis. Supplier will not make any unsolicited comparisons between any Evolution 3GS Product or New Innovative Product, on the one hand, and other products sold by Supplier to any competitor of Purchaser while sales by Supplier to Purchaser of such Evolution 3GS Product or New Innovative Product, as applicable, are subject to the exclusivity provisions of this Section III(B).

C.  Beginning 90 days after the Effective Date and for the remaining term of this Agreement, Purchaser shall not purchase or order any primary backing material from any third party. Notwithstanding the foregoing, Purchaser shall not be deemed to have breached any term of this Agreement if it purchases or orders primary backing material from any third party if Purchaser has first made a written offer to purchase such primary backing material from Supplier, specifying in such offer the specifications and volumes of primary backing material required by Purchaser, and (1) Supplier has refused such offer in writing, (2) Supplier has not accepted such offer on terms determined by Purchaser in its reasonable discretion to be more advantageous, when taken as a whole, to Purchaser than those otherwise available from third parties in good faith to Purchaser within ten (10) days of the first date of receipt of the offer or (3) Supplier has accepted such offer but is unable to meet such requirements for any reason whatsoever. The Purchaser has the right to solicit competing bids for primary backing material at any time during the agreement as long as the Supplier is given an opportunity to provide more advantageous terms to the Purchaser as described above.

D.  Technical meetings will take place between the parties at least every 3 months, where Supplier will inform Purchaser of all relevant innovative additions to its product range.

E.  Purchaser will consider switching from Evolution 3GS to Evolution Plus in 2009.

## SECTION IV. SUPPLIER PRICING

A.  Product Pricing Generally. The prices for Products purchased and sold hereunder are set forth in Schedule C.

B.  Most Favored Price Warranty. Supplier warrants to Purchaser that, based upon Purchaser's historic and projected future volume and on Supplier's volume discount policy, prices to Purchaser in North America will be priced at least 8% lower than industrial supplies of comparable prime grade product to any other customer of Supplier in Canada, United States and Mexico ("North America") and that supplies to Purchaser in Europe will be priced at least 8% lower than industrial supplies of comparable prime grade product to any other customer of Supplier in European Community Countries ("Europe").

## SECTION V. DELIVERY; WAREHOUSING AND SHIPPING

A.  Delivery of Product. For purposes of this Agreement, "delivery" of Product from Supplier to Purchaser shall occur in compliance with the delivery terms (Incoterm 2000) set forth in Schedule C except as otherwise determined under Section V(B). The maximum lead time (beginning when Purchaser places a purchase order and ending when the Product is delivered) for Product delivered under this Agreement and the required delivery time for Product shall be agreed upon in writing from time to time by the parties. Supplier shall invoice Purchaser for Products within 10 days of the delivery of Product.

3

8/28/2008

B.   Warehousing Product. Supplier will warehouse, at no additional cost to Purchaser, up to a three month supply of Products for use by Purchaser's European operations and up to a three month supply of Products for use in Purchaser's United States operations (the amounts of such three month supplies to be reasonably determined by Supplier based on Purchaser's forecasts and information about Purchaser's stock levels provided by Purchaser hereunder) for a maximum of 4 months pending shipment to Purchaser upon request by and as directed by Purchaser. Should the Supplier have insufficient warehouse space, then the Supplier and the Purchaser will use their best efforts to agree on an alternate storage solution with the Supplier paying reasonable incremental storage costs.

C.   Supplier shall package, invoice and clearly mark all Products warehoused under the foregoing conditions with Purchaser's name, and shall affix Purchaser's trademark, in dimensions no smaller than 7.5" by 10", to at least two sides of each pallet or skid of Products manufactured by Supplier specifically for Purchaser hereunder. The sale of all such warehoused Products is final, the title on all such Products has passed to Purchaser and such Products are considered to be "delivered" and shall be invoiced. Purchaser is fully responsible for any products following the passage of title including the risk of loss of such Products. However, Supplier will insure the Products in its warehouses for its account. Warehoused Products are available for immediate shipment to Supplier at Supplier's request during regular business hours and will be shipped without exception to Supplier after 4 months.

D.   Duties of Supplier with regard to Warehoused Products.

   1.   Supplier shall take all reasonable steps to protect Purchaser's ownership interest in the Products stored by Supplier after manufacture (the "Warehoused Products"). Supplier shall not cause the Warehoused Products to be subjected to any taxes, liens, encumbrances or security interests.

   2.   Supplier shall take commercially reasonable measures to store and protect the Warehoused Products from damage and/or loss, including, but not limited to, damage or loss arising from or related to humidity, water, temperature variations or extremes, wind, fire, catastrophe, theft, or commingling, negligence of Supplier's employees, and shall otherwise store the Warehoused Products separate and apart from other warehouse goods so that the Warehoused Products can be easily identified, inspected and inventoried. Supplier hereby warrants and represents that the storage site is currently, and shall be maintained as, a suitable warehouse for the storage of the Warehoused Products consistent with Supplier's duty of care.

## SECTION VI. PAYMENT TERMS

A.   Payment terms for Products purchased and sold hereunder not in excess of Purchaser's needs for the three months following the date of such purchase and sale are net 90 days for Products shipped to European destinations and net 45 days for Products shipped to North American destinations.

   1.   Payment terms for Products purchased and sold hereunder that exceed Purchaser's needs for the three months following the date of such purchase and sale are net 130 days for Products shipped to European destinations and net 70 days for Products shipped to North American destinations.

   2.   Notwithstanding the foregoing, payment terms for Products purchased and sold hereunder that exceed Purchaser's needs for the four months following the date of such purchase and sale are net 170 days for Products shipped to European destinations and net 110 days for Products shipped to North American destinations.

8/28/2008

4

3. Notwithstanding the foregoing, payment terms for Products purchased and sold hereunder that exceed Purchaser's needs for the five months following the date of such purchase and sale are net 210 days for Products shipped to European destinations and net 150 days for Products shipped to North American destinations.

4. At no time will the amount of the Product on hand at all locations exceed the Purchaser's six month rolling forecast, and, subject to the terms and conditions set forth in this Agreement, Purchaser may refuse over-shipments. In case a decreased 6 month forecast provided by Purchaser is less than the amount of Product on hand, then Supplier shall not be required to take back any Product that has been invoiced. Notwithstanding the foregoing, over-shipment by Supplier will not constitute a breach of this Agreement.

B. For the purpose of this Section VI and to facilitate easy tracking of the proper payment terms for each invoice, Supplier will determine each week – based on the Purchaser's rolling forecast provided under Section I.B - the quantity by Product that will be supplied under each of the payment terms and according to the provisions mentioned under previous clauses A and B. Supplier will communicate these quantities within four business days after receipt of the forecast provided by Purchaser and invoice accordingly. For the avoidance of doubt, multiple invoices may be made for any single shipment of Products if the use of multiple invoices is necessary or convenient to either party's compliance with the provisions of this section VI.

## SECTION VII. QUALITY, PRODUCT WARRANTY, INDEMNIFICATION, INSURANCE

A. Quality Standards. Within thirty (30) business days of the date of this Agreement, Supplier shall deliver to Purchaser for its review and comment a set of product specifications which will include the basic polymer type, yarn count (denier/dtex), shape of cross-section, dimensions and type of texturization of the products to be purchased and if applicable ranges of acceptable variation from such specifications for such product specifications (the "Draft Product Specifications") and performance criteria for the products, to include, without limitation, elongation, strength, heat shrinkage, light fastness and if applicable ranges of acceptable variation from such specifications (the "Draft Performance Criteria"). Within thirty (30) business days of receipt of the Draft Product Specifications and the Draft Performance Criteria, Purchaser shall provide to Supplier any comments that it has to the Draft Product Specifications or the Draft Performance Criteria. If Purchaser does not provide comments within such thirty (30) business day period, the Draft Product Specifications and the Draft Performance Criteria shall become the Product Specifications and the Performance Criteria, respectively. Purchaser and Supplier shall cooperate in good faith to resolve any disputes regarding the Draft Product Specifications or the Draft Performance Criteria. If all such disputes are resolved with respect to either or both of the Draft Product Specifications and the Draft Performance Criteria within sixty (60) business days of Purchaser's receipt of the Draft Product Specifications and the Draft Performance Criteria, then such document(s) shall become the Product Specifications or the Performance Criteria, as applicable. If any disputes regarding the Draft Performance Criteria or the Draft Product Specifications are unresolved within such sixty (60) business day period, the Product Specifications (if such remaining disputes related to the Draft Product Specifications) and/or the Performance Criteria (if such remaining disputes are related to the Draft Performance Criteria) shall be such specifications and/or criteria attached hereto as Schedule B together which such specifications and/or criteria, not in conflict with those attached hereto as Schedule B, as are commercially reasonable in light of the nature of the products and their intended use. The Supplier warrants that each and every product shipped to the purchaser will, at the time of such shipment, possess the same chemical composition as defined in the Product Specifications within the applicable ranges of acceptable variation from such specifications specified therein, and that each product will meet the Performance Criteria within the applicable ranges of acceptable variation from such criteria.

8/28/2008

5

B.  On or before the date of shipment of any Products, Supplier will provide information on the presence of chemical content in its Products that has been formally identified by US or European government agencies as of the time of such shipment to be harmful to human health or the environment in normal use or that has been regulated for such effects by law in North America or Europe. Supplier will make every reasonable effort to remove such chemical content from its Products or lower the content to levels that are not considered to be harmful; provided, however, that, under no circumstances shall Supplier be required to reduce such chemical content to levels below those imposed as maximums under applicable laws.

C.  Limited Warranty.

1.  Subject to the terms, conditions and limitations contained in this Agreement (including the provisions related to quality standards as set forth in Section VII(A)), Supplier warrants to Purchaser that under normal conditions during the applicable warranty period (as set forth in Supplier's Technical Information Manual Version 6.0, a copy of which has been provided to Purchaser), the Products will maintain their UV stability and tensile strength. For purposes of this warranty, a Product will be deemed to have maintained its UV stability and tensile strength if the original tensile strength of the Product does not decrease by more than fifty percent. The applicable warranty period begins on the earlier of (i) the date of installation of the synthetic turf containing the Product or (ii) the date that is one year after the date of Supplier's invoice for the Product. Supplier further warrants to Purchaser that the Products when delivered to Purchaser will comply in all respects with the Product Specifications, the Performance Criteria and the other requirements of this Agreement, will be free from visual defects and defects in materials and workmanship, and will not fade or change color beyond the extent permitted in the Product Specifications (failure of any of which shall constitute a "Defect"). In the case of a Product discovered within 365 days from delivery to Purchaser not to meet the Product Specifications, Supplier shall replace such Product without charge, delivered as instructed by Purchaser. Supplier will bear all material and transportation costs to deliver the replacement for Supplier's defective Product. Supplier shall not be responsible for removal or disposal of the defective turf or manufacture or installation of new turf. With regard to warranty claims made by Purchaser's customers, the parties agree that it shall be Purchaser's or its delegate's responsibility to investigate and otherwise handle the administration of all such claims with respect to such customer. Purchaser agrees to provide Supplier with prompt notice of any such warranty claims.

2.  Limitations on Coverage. This warranty does not apply (i) if the Product is used for any application other than sports fields or courts or landscape applications, (ii) to any damage caused during or on account of improper processing, installation or repairs, or (iii) to the extent that any defect or damage is caused by:

    (a)  Burns, cuts, accidents, vandalism, abuse, negligence or neglect;

    (b)  Improper design or failure of the sub-base of the sports field or court;

    (c)  Wear or abrasion caused by an inadequate sub-base;

    (d)  Use of infill products of, or superior to, the grade currently required by Purchaser's specifications (a copy of which has been provided to Supplier) or by Purchaser's specifications as they may be modified from time to time with Supplier's prior approval;

    (e)  Failure to maintain infill products at a level at or above that currently required by Purchaser's specifications (a copy of which has been provided to Supplier) or by Purchaser's specifications as they may be modified from time to time with Supplier's prior approval;

8/28/2008

6

US2000 10932660.3

(f) Use of footwear other than footwear with cleats as typically used for field sports or sports equipment with sharp or abrasive surfaces in contact with the turf;

(g) The playing surface being used other than for the purpose for which it was designed and installed;

(h) Use of cleaning chemicals, herbicides or pesticides;

(i) Use of improper cleaning methods (such as the use of bleach, solvents or high- or low-pH products or the use of abrasive brushes or pads);

(j) Any harmful chemical reaction to the Product caused by infill materials;

(k) Acts of God or other conditions beyond the reasonable control of Supplier;

(l) Improper processing of the Product (e.g., tufting, coating, texturizing or twisting);

(m) Post fibrillation after or during installation for purposes other than to get the infill materials in place; or

(n) Failure to maintain, protect or repair the Products or the turf.

3. All synthetic turf containing the Products is subject to normal wear and tear. Normal wear and tear is not a manufacturing defect and is not covered by this warranty. In addition to the factors mentioned above, wear and tear depends on, without limitation, the construction of the synthetic turf (fiber face weight, stitch rate, fiber pile height and gauge) and the intensity of use of the synthetic turf. Supplier shall not be responsible for any warranty issued or made by Purchaser to third parties, including, without limitation, any warranty made by Purchaser with respect to the useful life of the synthetic turf containing the Products. Purchaser should carefully read the latest versions of Supplier's product information materials and literature for information about optimizing the performance of the synthetic turf containing the Products.

4. No Other Warranties. THE WARRANTY PROVIDED HEREIN IS THE SOLE AND EXCLUSIVE WARRANTY WITH RESPECT TO SUPPLIER'S PRODUCTS AND SUPERSEDES ANY AND ALL OTHER WARRANTIES, ORAL OR WRITTEN, OF ANY TYPE RELATING TO SUPPLIER'S PRODUCTS. ANY PRODUCTS NOT COVERED BY THIS WARRANTY ARE SOLD "AS IS." THE REMEDY OF REPLACEMENT SET FORTH IN SECTION VII(D) IS THE SOLE OBLIGATION OF SUPPLIER, AND THE SOLE REMEDY OF PURCHASER, UNDER THE WARRANTY PROVIDED HEREIN. EXCEPT AS PROVIDED HEREIN, SUPPLIER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, NATURE OR DESCRIPTION WITH RESPECT TO ANY OF ITS PRODUCTS, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS OF ANY OF THE PRODUCTS FOR ANY PARTICULAR PURPOSE OR NON-INFRINGEMENT OF THIRD PARTY RIGHTS, AND SUPPLIER HEREBY DISCLAIMS THE SAME.

D. Other Claims.

1. Except with respect to warranty claims which shall be handled pursuant to Section VII(C), above, or intellectual property claims addressed in Section XI below, Supplier will, at Supplier's expense, defend, indemnify and save Purchaser harmless from all claims (except warranty claims), actions, suits, proceedings, liabilities, losses or damages, including costs of settlement, for property damage, personal injury or death which is in any way connected with manufacturing defects in Product. Supplier will not be required to so indemnify Purchaser for any claims arising from Purchaser's own negligence or against liabilities, losses or damages to the extent that such liabilities, losses or damages

7

8/28/2008

result directly from Purchasers actions or omissions and are not otherwise directly attributable to manufacturing defects in Products, in which case Purchaser agrees to defend and indemnify Supplier to the same extent that Supplier has agreed to indemnify Purchaser hereunder. Both parties agree that, should either party have a claim for indemnification against the other pursuant to this paragraph, the claiming party shall give prompt notice of the claim to the indemnifying party.

2.      Supplier shall not at any time take any action that violates, and shall at all times comply with, any and all laws, rules and regulations applicable or pertaining to the Products or Supplier's performance under this Agreement, and shall defend, indemnify, and hold harmless Purchaser from and against any and all fines, penalties, liabilities, damages or expenses arising out of Supplier's failure to comply with any such laws, rules or regulations. Purchaser shall not at any time take any action that violates, and shall at all times comply with, any and all laws, rules and regulations applicable or pertaining to the Products or Purchaser's performance under this Agreement, and shall defend, indemnify, and hold harmless Supplier from and against any and all fines, penalties, liabilities, damages or expenses arising out of Purchaser's failure to comply with any such laws, rules or regulations.

3.      The obligations of either party to indemnify the other under this Section VII(D) for third party claims ("Claims"), will be subject to the following terms and conditions:

        3.1.    Any party against whom any Claim is asserted will give the other party written notice of such Claim promptly after learning of such Claim, and the indemnifying party may, at its option, undertake the defense, contest or settlement of such Claim, subject to this Agreement, by representatives of its own choosing. If the indemnifying party does not defend, contest or settle such Claim, then the indemnified party may contest and defend (but not settle) such Claim. Failure to give prompt notice of a Claim under this Agreement shall not affect the indemnifying party's obligations under this Section VII(D), except to the extent that the indemnifying party is materially prejudiced by such failure to give prompt notice. Notice of intention so to contest and defend shall be given by the indemnifying party to the indemnified party within twenty (20) business days after the indemnified party provides a notice of Claim (but in all events, at least five business days prior to the date that an answer to such Claim is due to be filed to the extent reasonably practicable):

        3.2.    If the indemnifying party fails to assume the defense of such Claim within the required time period, the indemnified party against whom such Claim has been made will (upon further notice to the indemnifying party) have the right to undertake the defense, compromise or settlement of such Claim on behalf of and for the account and risk, and at the expense, of the indemnifying party, subject to the right of the indemnifying party to assume the defense of such Claim at any time prior to settlement, compromise or final determination of such Claim.

        3.3.    If the indemnifying party assumes such defense, the indemnified party will have the right to participate in the defense thereof and to employ counsel, at its own expense (which expense shall not constitute losses subject to indemnification by the indemnifying party, unless outside counsel to the indemnified party reasonably determines that, because of a conflict of interest, the indemnifying party is not adequately representing any interests of the indemnified party, or unless the indemnifying party has not employed counsel to assume the defense of such action within a reasonable time, and then only to the extent that such expenses are reasonable), separate from the counsel employed by the indemnifying party, it being understood, however, that the indemnifying party shall control such defense and settlement. The indemnifying party shall be liable for the

8

8/28/2008

fees and expenses of counsel employed by the Indemnified party for any period during which the Indemnifying party has not assumed the defense thereof.

E.     Supplier agrees to maintain, at its own expense, a policy or policies of comprehensive general liability insurance with vendor's and product endorsements with a combined aggregate amount of at least $5,000,000 and a single limit of at least $1,000,000. All such policies will provide that the coverage will not be terminated without at least thirty (30) days prior written notice to Purchaser. Certificates of insurance will be furnished to Purchaser upon request.

F.     IN NO EVENT SHALL EITHER PARTY TO THIS AGREEMENT BE LIABLE TO THE OTHER PARTY OR TO ANY PERSON CLAIMING THROUGH OR UNDER SUCH OTHER PARTY FOR ANY LOST PROFITS OR FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, WHETHER IN AN ACTION IN CONTRACT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY) ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

G.     AT NO TIME SHALL SUPPLIER AND ITS AFFILIATES' TOTAL CUMULATIVE LIABILITY IN CONNECTION WITH THIS AGREEMENT, FROM ALL CAUSES OF ACTION OF ANY KIND, EXCEED THE AMOUNT ACTUALLY PAID BY PURCHASER TO SUPPLIER DURING THE PRECEDING 12 MONTHS.

## SECTION VIII. CHANGES

Purchaser may at any time prior to 14 days of manufacture, by written notice, make changes within the scope of this Agreement or any Purchase Order issued pursuant to this Agreement, regarding, but not limited to, methods of shipment, packaging, and/or time of delivery. Except as otherwise expressly set forth herein, Supplier may not make changes to the terms of this Agreement or any of the processes contemplated hereunder, including, but not limited to Specifications, processes or material, without first obtaining express written approval from Purchaser.

## SECTION IX. COMPLIANCE WITH ALL LAWS/INDEMNIFICATION

Supplier hereby agrees that all services, Products, and processes covered hereby shall be manufactured and furnished by Supplier in accordance with, and shall conform to, all applicable state and local laws or regulations including environmental regulations, licenses or permits.

## SECTION X. PURCHASER CONFIDENTIAL INFORMATION

Supplier and Purchaser understand and promise that each will forever hold and protect in strict confidence on behalf of itself and its employees, all confidential information derived from the other Party or its parents, subsidiaries and affiliates. A party shall at the other party's request immediately return to the requesting Party or certify the destruction of all documents received by that Party which contain the confidential information.

## SECTION XI. INTELLECTUAL PROPERTY

A.     Ownership of Intellectual Property. Each Party remains the owner of its own intellectual property and nothing in this agreement shall be construed as an express or implied grant nor assignment of ownership rights on each Party's respective intellectual property.

B.     Supplier warrants to Purchaser that it is the owner of all Intellectual Property rights attached to the Products and that the Products are not manufactured under any license from a third party

9

8/28/2008

whatsoever. Supplier further warrants that the Products shall not infringe any intellectual property or other rights of third Parties.

C.   Use of trademarks.  Purchaser may use the Supplier's Trademarks including the Evolution 3GS trademark in relation to Evolution products in case they wish to do so, but will refer to Supplier as owner of this mark in case they do so.

    1.   Supplier may use the FieldTurf trademark in reference to the use by Purchaser of Supplier products in case they wish to do so, but will refer to Purchaser as owner of this name in case they do so.

D.   IP Infringement. Should the Products infringe any patent or misappropriate any trade secrets, Supplier shall defend at its own expense, every suit or claim for infringement or misappropriation related to the Products and indemnify, defend and hold Purchaser and its customers harmless from all liability, loss or· expense, including costs of settlement and reasonable attorney's fees, resulting from any claim that Purchase's or any customer's use, possession, sale or resale of any Products or part thereof infringes any patent, or is a misappropriation of any trade secret or other proprietary right covering the Product of any part thereof.

## SECTION XII. RELATIONSHIP OF THE PARTIES

Purchaser and Supplier understand and contemplate that their relationship will be solely that of supplier and purchaser. Nothing in this Agreement is intended or will be construed to create any partnership, joint venture, joint enterprise or other similar joint relationship, nor shall either party be deemed to be an employee, agent or legal representative of the other for any purpose whatsoever. Neither party will have any authority, whether express, implied or apparent to assume or create any obligations for, on behalf of, in the name of, or for the benefit of the other.

## SECTION XIII. NOTICES

All notices, consents, waivers and other communications required or permitted by this Agreement shall be in writing and shall be deemed given to a party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid); (b) sent by facsimile or e-mail with confirmation of transmission by the transmitting equipment; or (c) received or rejected by the addressee, if sent by certified mail, return receipt requested, in each case to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the person (by name or title) designated below (or to such other address, facsimile number, e-mail address or person as a party may designate by notice to the other parties):

        **Purchaser:** Fieldturf Tarkett
                Attention:   Joe Fields
                Address:      8088 Montview
                                  Montreal, Quebec H4P 2L7 Canada
                Fax No.:
                E-mail address:      jfields@fieldturf.com

                Fieldturf Tarkett SAS
                Attention:   Marie-Christine Gillet
                Address:      2 Rue de L'Egalité
                                    92748 NANTERRE Cedex
                                  France
                Fax No.:      +33 (0) 1 41 20 47 66
                E-mail address:      Marie-christine.gillet@tarkett.com

                            8/28/2008

**Supplier:** TenCate Grass North America
Attention: Mr. Don Olsen
Address: 6501 Mall Boulevard
Union City, GA 30291, USA
Fax No.: +1 770 969 1010
E-mail address: d.olsen@tencate.com

Thiolon TenCate Europe B.V.
Attention: Mr. Jeroen Van Balen
Address: P.O. Box 9
7440 AA Nijverdal, The Netherlands
Fax No.: +31 548 633 392
E-mail address: j.vanbalen@tencate.com

Thiolon TenCate Middle East L.L.C.
Attention: Mr. Jeroen Van Balen
Address: P.O.Box 25628
Dubai, United Arab Emirates
Fax No.: +31 548 633 392
E-mail address: j.vanbalen@tencate.com

### SECTION XIV. OTHER PROVISIONS

A.   Neither party may assign this Agreement or any Purchase Order or any part thereof without first obtaining the express written consent of the other; provided, however, that Supplier shall have the right to assign any or all of its rights or obligations hereunder to any of its affiliates.

B.   Neither party to this Agreement shall be liable for its failure to perform any of its obligations hereunder during any period in which such performance is delayed by fire, natural disaster, war, embargo, strike, riot, or the intervention of any government authority, provided that the party suffering such delay immediately notifies the other party of the delay.

C.   The terms, provisions, representations and warranties contained in this Agreement shall survive expirations or earlier termination of this Agreement notwithstanding delivery, acceptance of or payment for the Product ordered pursuant to this Agreement; provided, however, that no claims under Section V related to any Products shall survive acceptance of such Products by Purchaser.

D.   The printed terms and conditions of any purchase order, acknowledgment form, invoice or other business form of Purchaser and Supplier shall not apply to any purchase or sale under this Agreement.

E.   This Agreement shall be interpreted and governed in all respects by the laws of the State of New York, USA, without regard to its principles of conflicts of law. The parties to this Agreement hereby irrevocably consent and submit to the jurisdiction and forum of the United States District Court for the Northern District of Georgia or the Superior Court of Fulton County, Georgia in all questions and controversies arising out of this Agreement. Supplier and Purchaser acknowledge and agree that this Agreement and Products sold hereunder are not subject to any provision of the United Nations Convention on the International Sale of Goods and the application of such Convention is hereby expressly disclaimed.

F.   This Agreement is the complete and exclusive agreement between the parties relating to the subject matter hereof, which supersedes all prior written proposals, negotiations and/or communications between the parties relating to this Agreement. No modification shall be valid unless set forth in writing and signed by the parties, except as otherwise provided herein.

11

G. The failure in any one or more instances of a party to insist upon performance of any of the terms, covenants or conditions of this Agreement or to exercise any right or privilege conferred in this Agreement, or the waiver by said party of any breach of any of the terms, covenants or conditions of this Agreement, shall not be construed as a subsequent waiver of any such terms, covenants, conditions, rights or privileges, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had occurred.

H. The parties acknowledge and agree that irreparable injury will result from a breach of any provision of this Agreement, and money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, either party (in addition to any other remedies which may be available to it) shall be entitled to one or more preliminary or permanent injunctions (i) restraining any act which would constitute a breach or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

I. This Agreement may be executed in 4 original versions.

[ *Signatures on Following Page* ]

12

IN WITNESS WHEREOF, intended to be legally bound hereby, the authorized representatives of the parties have executed this Agreement effective as of the date first set forth above.

**Purchaser:**
FieldTurf Tarkett
FieldTurf Tarkett SAS

By:

Name: Joe Fields
Title: CEO

**Supplier:**
TenCate Grass North America, Mr Don Olsen
Thiolon TenCate Europe, Mr Jeroen van Balen
Thiolon TenCate Middle East, Mr Jeroen van Balen

By:                    August 20, 2008

Name: Guido Vliegen
Title: VP Sales, Marketing &
Business Development

13

US2000 10032660.3



## 12.2   Exhibit A to TenCate Grass Limited Warranty

Exhibit A describes the warranty on UV stability and tensile strength. For purposes of this warranty, a product will be deemed to have maintained its UV stability and tensile strength if the original tensile strength of the product does not decrease by more than fifty percent.

| Solar Activity in W/m² | LSR 9000 XP Pro 8000 XP Pro 9000 XP Pro 10,000 Xtreme XP 10,300 |
|---|---|
| 100 – 160 | 11 years |
| 161 – 200 | 10 years |
| 201 – 240 | 9 years |
| 241 and more | 8 years |

Solar activity of the turf installation site in W/m² is determined according to the climatic map of the world published by the KNMI, a copy of which is included in paragraph 12.3. Please be aware that TenCate Grass does not warrant wear and tear caused by any use of pitches incorporating Thiolon® fibers.

Everywhere, where "TenCate Grass" is written in this warranty, this can be substituted for "TenCate Grass North America", "TenCate Grass EMEA" and "TenCate Grass Asia" where applicable.

Explanation of tensile strength
The tensile strength of a fiber is the maximum force that can be put on the fiber just before it breaks. In the usual tensile test, a sample of fiber is clamped in the tensile tester. The fiber is then slowly stretched until it breaks. While doing this, the force needed and the length of the fiber sample are continuously recorded. After the fiber breaks, the maximum force in the experiment and the maximum elongation is determined from the recorded data.

The tensile strength does not give any information about the hardness or softness of the fiber. As explained above, the tensile strength and elongation only give information about the breaking point of a fiber. A separate figure which tells something about the fiber is needed when there is only a small deformation. This number is called the modulus, and it can also be determined using the same test.

## 12.3 Annual average global radiation in W/m²



Case 4:14-cv-09900-DMC-DMC Document 22-7 (Court only) Filed 05/01/13 Page 17 of 20

### SCHEDULE A
**Products and Specifications**

Evolution 3GS, "hardsoft" (for "Duo fields")

Evolution Plus

Any other polyolefin based fibers for production of artificial turf Purchaser will require, to be added in this schedule.

14

SCHEDULE B
Default Product Specifications and Performance Criteria

## TENCATE GRASS External Specifications

### TENCATE
materials that make a difference

| Yarn Description | CMF 1500x6 FTX |
| Version / BSN | 1 / 26 |
| Writer | JCA |
| Date | February 22, 2008 |

| Yarn Description | CMF 1500x6 FTX |
|---|---|
| Yarn Code | EVOLUTION |
| Colours | |
| Basic polymer | Polyethylene |

### THIOLON YARN SPECIFICATIONS

| | UNIT | Typical value | Minimum | Maximum |
|---|---|---|---|---|
| Yarn count | * Denier | 9000 | 8280 | 9720 |
| Monofilament Thickness | * micron | Spine 235µ | | |
| Monofilament Width | * mm | Nominal 1,3mm | | |
| Cross section | | Evolution | | |
| Turns | * T/m | 30 | 23 | 36 |
| Number of Filaments | | 6 | | |
| Tensile strenght (peak value) | * N | 115 | 95 | |
| Elongation at break | * % | 70 | 45 | |
| Shrinkage at 83 °C | * % | 5,3 | | 8.0 |
| Style of texturising | KdK | | | |
| Stitch length | mm | | - | - |
| Maximum confing temperature | °C | 83 | | |
| Light fastness | blue scale | 7/8 | 7 | 8 |

* Typical values are based on the mean values of 12 different bobbins
  Test procedures: Ten Cate Thiolon® standards

Note: The above mentioned specifications are for reference only.

| Date: | February 22, 2008 | Authorization signature: |

15

US2000 10932660.3

## SCHEDULE C
## PRICES

**1. Prices applicable as of July 1, 2008 until August 31, 2008:**

*The prices and conditions as confirmed in an email from Guido Vliegen to David Moszkowski dated March 3rd, 2008 will apply until August 31st, 2008.*

**2. Prices applicable for the period of September 1, 2008 – December 31, 2008**

Prices for the period of September 1st, 2008 – December 31st, 2008 for Evolution 3GS and "hardsoft" in the colors "Field Green", "Tarkett green" and "Field Green/Olive duo color".

- SUPPLIER Dubai to PURCHASER Auchel  :  € 3.20 /kg CPT Auchel
- SUPPLIER Dubai to PURCHASER Dalton  :  $ 2.28 /lb CPT Dalton, GA
- SUPPLIER Dayton to PURCHASER Dalton  :  $ 2.28 /lb EXW Dayton, TN

For other colors the following surcharges apply:
- White & yellow       25%
- All other colors       33% (allowing for min. 12 tons production batch)

**3. Prices applicable for the period of September 1, 2008 – December 31, 2008**

. Theoretical pricing of Evolution Plus™ for the period of September 1st, 2008 – December 31st, 2008 will be the basis for future deliveries of Evolution Plus. These prices reflect a $0.25/kg additional price for Evolution Plus over Evolution 3GS at current exchange and resin rates.

- SUPPLIER Dubai to PURCHASER Auchel  :  € 3.37 /kg CPT Auchel
- SUPPLIER Dubai to PURCHASER Dalton  :  $ 2.40 /lb CPT Dalton, GA
- SUPPLIER Dayton to PURCHASER Dalton  :  $ 2.40 /lb EXW Dayton, TN

For other colors the following surcharges apply:
- White & yellow       25%
- All other colors       33% (allowing for min. 12 tons production batch)

**4. Prices applicable for the period of January 1, 2009 – December 31, 2011 (except if the agreement is terminated earlier)**

Parties agree that prices (as above mentioned) may be changed during the contract period, every 6 months only for reasons of increases or decreases in resin cost. SUPPLIER will provide PURCHASER with a copy of ICIS index for United States ($) and Europe (€), every 6 months, starting on July 1st of 2008.

The first price revision for resin cost changes will therefore happen January 1st of 2009, based on the difference between the ICIS index of December 31st, 2008 and the ICIS index of June 30th, 2008.

With regard to raw material cost increases, parties will calculate the mean between ICIS high and ICIS low for C4 LLDPE resin (the "Mean"), and in case at the beginning of each 6-month period this figure has risen, SUPPLIER may implement an increase of 110 % of the difference between the Mean of the most recent ICIS index and the Mean from the preceding 6 month ICIS index. Likewise, if this figure has declined, then SUPPLIER will implement a decrease of 110% of the difference.

A theoretical example of this method is described as follows:

8/28/2008

16

|  | USA (US$ cents/lb) 1-1-2009 1-7-2008 | | Europe (Euro cents/kg) 1-1-2009 1-7-2008 | |
|---|---|---|---|---|
| ICIS average for C4 (but) | 105 | 100 | 104 | 100 |

In this case price to Purchaser will increase by 1.1 x (105-100) = US$ 0.06 per lb; prices for Europe will increase by US or € 0.04 per kg.

17