IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

FIELDTURF USA INC., et al.,

    Plaintiffs,

       v.

TENCATE THIOLON MIDDLE
EAST, LLC formerly known as
Mattex Leisure Industries, et al.,

    Defendants.

CIVIL ACTION FILE
NO. 4:11-CV-50-TWT

OPINION AND ORDER

     This is a breach of contract action.  It is before the Court on the Plaintiffs'

Motion for Partial Summary Judgment Dismissing Counts 2-9 of Defendants'

Counterclaim [Doc. 354] and the Defendants' Motion for Summary Judgment [Doc.

358].  For the reasons set forth below, the Plaintiffs' Motion for Partial Summary

Judgment [Doc. 354] is GRANTED and the Defendants' Motion for Summary

Judgment [Doc. 358] is DENIED.

## I. Background

     This suit arises from three contracts to supply polyethylene fiber used to make

artificial grass turf for athletic fields.  In 2003, FieldTurf USA Inc., FieldTurf Inc., and

FieldTurf Tarkett SAS (collectively, the "Plaintiffs" or "FieldTurf") began

negotiations to purchase monofilament fiber from Mattex Leisure Industries ("Mattex"). In September 2005, the Plaintiffs entered into a supply agreement under which Mattex would provide monofilament fiber called Evolution exclusively to the Plaintiffs (the "2005 Agreement"). (See Defs.' Mot. for Summ. J., Ex. I). FieldTurf bought Evolution from Mattex for use in construction of artificial grass turf systems around the globe. (Compl. ¶ 1). In February 2006, Mattex issued a warranty guaranteeing Evolution's performance for six to nine years. (See id., Ex. J). The parties entered into another supply agreement in November 2006 (the "2006 Agreement"). (See Compl., Ex. C). The 2006 Agreement included the MLI Limited Warranty Version 1-June 2006 (the "2006 Warranty"). (See id., Ex. M).

In February 2007, Royal TenCate N.V., a Dutch company, acquired certain assets of Mattex pursuant to an asset purchase agreement (the "Asset Purchase Agreement"). (See Defs.' Mot. for Summ. J., Exs. N, O, & P). Royal TenCate then nominated its rights and obligations under the Asset Purchase Agreement to TenCate Thiolon Middle East, LLC ("TenCate ME"). In July 2008, TenCate ME, Polyloom Corporation of America ("Polyloom"), TenCate Thiolon B.V. ("TenCate B.V."), and the Plaintiffs entered into a third supply agreement whereby TenCate provided FieldTurf with Evolution yarn (the "2008 Agreement"). (See Defs.' Mot. for Summ.

J., Ex. T).  TenCate terminated the 2008 Supply Agreement as of March 2, 2011.
(Compl. ¶ 76; Answer ¶ 76).

FieldTurf alleges that in 2009 and 2010 it began receiving complaints about the
durability of the artificial turf fields it had installed using TenCate's Evolution fiber.
(Compl. ¶ 85).  According to FieldTurf, its own subsequent testing demonstrated that
the Evolution yarn was degrading prematurely.  (Compl. ¶¶ 96-124).  In December
2010, FieldTurf announced the release of Revolution, a fiber product that would
compete with Evolution.  (Counterclaim ¶ 38).

On March 1, 2011, the Plaintiffs sued TenCate ME, Polyloom, and TenCate
B.V. (collectively, the "Defendants" or "TenCate") for breach of contract, breach of
warranty, and fraud.  See [Doc. 1].  The Defendants answered and filed counterclaims
alleging commercial disparagement, intentional interference with business relations,
civil conspiracy, and unfair competition.  See [Doc. 54].  The Court dismissed the
Plaintiffs' claims for breaches of the 2005 and 2006 Agreements against Polyloom
and TenCate B.V. and dismissed the Defendants' counterclaims for commercial
disparagement, civil conspiracy, as well as claims for unfair competition under various
state laws while allowing the unfair competition under Georgia law claim to remain.
See [Docs. 53 & 86].  The Plaintiffs now move for summary judgment on the
Defendants' counterclaims for false advertising, trademark infringement, federal

unfair competition, unfair competition under Georgia law, common law trademark infringement, slander, libel, and tortious interference with business relations. The Defendants move for summary judgment on the Plaintiffs' claims for fraud, breach of contract, breach of express warranty, breach of implied warranty, and on the Plaintiffs' requests for damages.

## II.  Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III.  Discussion

A.    The Plaintiffs' Motion for Partial Summary Judgment

      1.    False Advertising

FieldTurf argues that the Defendants' claim for false advertising must fail because the Defendants have not shown that any FieldTurf advertisements were literally false.  To prevail on a false advertising claim under the Lanham Act, TenCate "must establish that (1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been – or is likely to be – injured as a result of the false advertising."  Hickson Corp. v. Northern Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (quoting Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1247 (11th Cir. 2002)).  "When determining whether an advertisement is literally false or misleading, courts must analyze the message conveyed in full context, and must view the face of the statement in its entirety."  Osmose, Inc. v. Viance, LLC, 612 F.3d 1298, 1308 (11th Cir. 2010) (quoting 1-800 Contacts, 299 F.3d at 1248 (internal marks and alterations omitted)).  "The distinction between literally false and merely misleading is often a 'fine line.'"  Id. (citing American Med. Corp. v. Axiom Wordwide, Inc., 522

F.3d 1211, 1225 n.12 (11th Cir. 2008)).  "The ambiguity of the statement at issue ...
is significant," and "[s]tatements that have an unambiguous meaning, either facially
or considered in context, may be classified as literally false."  Id. at 1308-09 (citing
United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1180 (8th Cir. 1996)).  "If the court
deems an advertisement to be literally false, then the movant is not required to present
evidence of consumer deception," but if the court concludes the advertisement is "true
but misleading, then the movant is required to present evidence of deception."  Id. at
1319 (quoting 1-800 Contacts, 299 F.3d at 1247).  TenCate argues that FieldTurf's
advertisements about Revolution were literally false when they claimed that
Revolution was the "industry's strongest fiber," that Revolution had "the strongest
ultraviolet inhibitor in the industry," that Revolution was "the most natural looking"
fiber, and that Revolution "has the strongest tuft bind."  (See Defs.' Resp. in Opp'n
to Pls.' Mot. for Partial Summ. J., Ex. 3).

a.    Industry's Strongest Fiber

TenCate argues that FieldTurf's use of the phrase "industry's strongest fiber"
with respect to Revolution is false advertising.  TenCate argues the advertisement
must refer to tensile strength and provides evidence that Revolution does not contain
the strongest tensile strength in the industry.  (Willard Dep. at 356-57).  However, the
global group director of TenCate grass admitted in his deposition that fiber "strength

can be measured in many ways" and that the assertion that the fiber is the strongest in the industry could be understood in several ways. (See Pls.' Mot. for Partial Summ J., Ex. 2, Vliegen Dep. at 34, 167-68). The Court concludes, based on the competing evidence, that the phrase "industry's strongest fiber" is not susceptible to only one interpretation. Because the statement is ambiguous and could cover several different meanings of "strength" aside from "tensile strength," TenCate has not shown that the statement was literally false. See Osmose, 612 F.3d at 1309 ("As the meaning of the statement becomes less clear, however, and it becomes susceptible to multiple meanings, the statement is more likely to be merely misleading."). Because TenCate has not offered any evidence of consumer deception, FieldTurf's motion for partial summary judgment with respect to the false advertising claim stemming from FieldTurf's "industry's strongest fiber" promotion should be granted. See id. at 1319 (requiring evidence of consumer deception when the advertisement at issue is only misleading).

### b.    Strongest Ultraviolet Inhibitor

TenCate argues that FieldTurf's claim that Revolution contains the "strongest ultraviolet inhibitor technology in the industry" is false. TenCate has shown that the UV stabilizer in Revolution was "better or equal to what others were using" in the industry. (See Defs.' Br. in Opp'n to Pls.' Mot. for Partial Summ. J., Ex. 1, Gill. Dep.

at 162-63).  This evidence, however, does not establish that FieldTurf's advertisement was literally false, only that the advertisement was phrased in a manner which may have misled consumers about the strength of Revolution's ultraviolet inhibitor technology.  However, TenCate has not come forward with evidence of consumer deception to support a claim that the advertisement was unlawfully misleading.  See Osmose, 612 F.3d at 1319 (requiring evidence of consumer deception when the advertisement at issue is only misleading); Hickson, 357 F.3d at 1260 (stating that the burden is on the party bringing the claim to show the advertisement is false).  Accordingly, FieldTurf's motion for partial summary judgment should be granted with respect to its use of the phrase "strongest ultraviolet inhibitor."

c.    Most Natural Looking Fiber[1]

TenCate argues that FieldTurf's advertisement that Revolution is the "most natural looking fiber" in the industry is literally false.  FieldTurf contends the phrase is merely subjective "puffing."  "'Puffing' is exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely and is not actionable under [the Lanham Act]."  Atlanta Allergy & Asthma Clinic, P.A. v. Allergy & Asthma of

---

[1]TenCate did not assert the false advertising claim with respect to the "natural looking" advertisement in its counterclaim, but did assert it in its response to FieldTurf's motion. (See Counterclaim ¶¶ 1-131).  Although the claim may not be properly brought, the Court nonetheless concludes that the advertisement including the phrase "natural looking" were non-actionable puffing.

Atlanta, LLC, 685 F. Supp. 2d 1360, 1380 (N.D. Ga. 2010) (quoting Southland Sod

Farms v. Stover Seed Co., 108 F.3d 1134, 1145 (9th Cir. 1997)).  The Court finds that

the "most natural looking" advertisement was merely puffing.  Although a TenCate

expert testified that turf fiber becomes more natural looking by minimizing gloss and

scattering light reflection, the same expert admitted in his deposition that one cannot

prove whether any one fiber type is more natural looking than another fiber type.  (See

Defs.' Resp. in Opp'n to Pls.' Mot. for Partial Summ. J., Ex. 31, at 9-11; Pls.' Reply

in Support of Mot. for Partial Summ. J., Ex. 8, Auguste Dep. at 554-55); Procter &

Gamble Co. v. Kimberly-Clark Corp., 569 F. Supp. 2d 796, 801 (E.D. Wis. 2008)

(noting that "it is impossible to demonstrate conclusively (for Lanham Act purposes)

whether one brand of diapers 'fits more naturally'").  Accordingly, because TenCate

has not shown that FieldTurf's advertisement was false or that it was even misleading,

and because the Court concludes the statement was puffery, FieldTurf's motion for

partial summary judgment should be granted in this respect.

d.    Strongest Tuft Bind

FieldTurf seeks summary judgment on TenCate's claim that advertisements

stating that Revolution had the "strongest tuft bind" were false because TenCate does

not have standing to challenge the advertisements.  FieldTurf argues that "tuft bind"

relates to "how hard it is to pull a tuft of fiber out of its backing" and has nothing to

do with the fiber itself.  (See Pls.' Br. in Supp. of Pls.' Mot. for Partial Summ. J., at 25).  "To demonstrate Article III standing, a plaintiff must allege that (1) he has suffered an actual or threatened injury, (2) the injury is fairly traceable to the challenged conduct of the defendant, and (3) the injury is likely to be redressed by a favorable ruling."  Phoenix of Broward, Inc. v. McDonald's Corp., 489 F.3d 1156, 1161 (11th Cir. 2007) (citing Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County, 450 F.3d 1295, 1304 (11th Cir. 2006)).  Additionally, the Eleventh Circuit also applies prudential standing limitations to false advertising claims under the Lanham Act.  See Phoenix of Broward, 489 F.3d at 1163.  In assessing prudential standing, the Court must consider:

> (1) The nature of the plaintiff's alleged injury: Is the injury of a type that Congress sought to redress in providing a private remedy for violations of the Lanham Act? (2) The directness or indirectness of the asserted injury; (3) The proximity or remoteness of the party to the alleged injurious conduct; (4) The speculativeness of the damages claim; [and] (5) The risk of duplicative damages or complexity in apportioning damages.

Id. at 1163-64 (quoting Conte Bros. Automotive, Inc. v. Quaker State-Slick 50, Inc., 165 F.3d 221, 233 (3d Cir. 1998)).  The focus of the Lanham Act is to protect "commercial interests that have been harmed by a competitor's false advertising."  Id. at 1168 (quoting Conte Bros., 165 F.3d at 234).  The Court concludes that the

prudential standing limitations counsel against TenCate's standing for this claim, and therefore does not address the Article III standing requirements.

Here, TenCate has shown that its commercial interests may have been harmed because FieldTurf's advertisements about "tuft bind" may have led end-users to purchase turf through FieldTurf rather than through a TenCate-supplied turf producer, and this evidence counsels toward prudential standing.  (See Defs.' Br. in Opp'n to Pls.' Mot. for Partial Summ. J., Ex. 3, part 8, at ALMA00001039, Ex. 18).  However, the first factor does not counsel heavily toward granting prudential standing because the advertisements at issue promotes Revolution in a variety of ways and there is no indication that the brief mention of an "industry leading 9lbs. of tuft bind" persuaded a purchaser more than any other promotion of Revolution.  (See id. at ALMA00001036-40).  The second factor, concerning the directness of the injury, counsels slightly against prudential standing because FieldTurf and TenCate are not generally competing to sell the same products to the same end-users, and "the second factor weighs in favor of standing in cases where 'one competitor directly injures another by making false statements about its own goods and thus influences customers to buy its product instead of the competitor's product." Phoenix of Broward, 489 F.3d at 1169 (quoting Logan v. Burgers Ozark Country Cured Hams Inc., 263 F.3d. 447,

460 (5th Cir. 2001)).[2]  The third factor counsels toward prudential standing because TenCate is a commercial entity competing in the general market for artificial turf and is therefore connected to the effects of the false advertising, although FieldTurf sells complete artificial turf fields to end-users and TenCate does not.  See id. at 1169-70 (noting that consumers and others with attenuated connections to the market do not satisfy the third factor). The fourth factor, however, counsels against prudential standing because determining the profits that FieldTurf secured and the revenues that TenCate lost due to the "tuft bind" claims involves too much speculation.  FieldTurf's products include far more than just "tuft bind," and "it requires too much speculation to conclude that an ascertainable percentage of both the increase in [FieldTurf's] sales

---

[2]TenCate argues that FieldTurf's advertisements constituted deceptive, comparative advertising and that "a presumption of causation and harm should apply to claims for actual damages when a defendant disseminates willfully deceptive, comparative advertising." Trilink Saw Chain, LLC v. Blount, Inc., 583 F. Supp. 2d 1293, 1321 (N.D. Ga. 2008).  However, the advertisements relating to "tuft bind" that TenCate points to does not engage in deceptive, comparative advertising.  The four-page pamphlet only says that third-party fiber manufacturer's "quality began to suffer" and repeats Revolution's motto: "This is no evolution. This is revolution." (See Defs.' Br. in Opp'n to Pls.' Mot. for Partial Summ. J., Ex. 3, part 8, at ALMA00001036-40).  With respect to tuft bind, the advertisements only state that Revolution includes the "strongest tuft bind in the industry" but does not compare the tuft bind with the tuft bind of any competitors, including TenCate.  (See id.)  Because the "tuft bind" advertisements do not directly compare Revolution with any TenCate product, they are not "willfully deceptive, comparative advertising" that earns a presumption of causation and harm.  See Trilink Saw Chain, LLC, 583 F. Supp. 2d at 1321.

and the concomitant decrease in [TenCate's] sales [during the advertising period] is directly attributable to [FieldTurf's] misrepresentations" about tuft bind when many factors can influence an end-user's decision to purchase an artificial turf field.  See id. at 1171.  The fifth factor also weighs against prudential standing because, should the Court grant standing to TenCate, "every competitor in the market [for artificial turf and its components] could sue," thus creating the risk of duplicative damages.  Id. at 1172-73 (quoting Procter & Gamble v. Amway Corp., 242 F.3d 539, 564 (5th Cir. 2001)); Logan, 263 F.3d at 461 (concluding the fifth factor supports prudential standing when the plaintiff was the only plaintiff who could bring a claim for false advertising against the defendant).  Accordingly, because the weight of the prudential standing factors, including the speculativeness of any damages claim, counsels against allowing TenCate to assert its claim for false advertising with respect to "tuft binds," the Court concludes TenCate does not have standing and FieldTurf's motion should be granted in this respect.  Therefore, the Court will grant summary judgment to FieldTurf on all of TenCate's claims relating to false advertising.

2.   <u>Trademark Infringement and Unfair Competition</u>

The Plaintiffs seek summary judgment on the Defendants' counterclaims for Trademark Infringement under the Lanham Act, 15 U.S.C. § 1114, unfair competition under the Lanham Act, unfair competition under the Georgia Unfair and Deceptive

Trade Practices Act, O.C.G.A. § 10-1-370, and common law infringement.  The Plaintiffs argue that the Defendants are unable to show that the Plaintiffs' usage of their "Revolution" trademark has caused any confusion in relation to the Defendants' "Evolution" trademark, and the lack of consumer confusion defeats all of the Defendants' claims for infringement and unfair competition.  See Tana v. Dantanna's, 611 F.3d 767, 782-83 (11th Cir. 2010) (noting that the elements to establish a claim under Georgia's UDTPA and federal infringement claims were the same); Kason Indus. v. Component Hardware Group, 120 F.3d 1199, 1203 (11th Cir. 1997) (noting that federal unfair competition under the Lanham Act and under Georgia's UDTPA are "governed by the same standard"); SCQuARE Int'l, Ltd. v. BBDO Atlanta, Inc., 455 F. Supp. 2d 1347, 1365 (N.D. Ga. 2006) (applying "likelihood of confusion" standard to Georgia common law infringement claim).

      To determine whether there is a likelihood of confusion, the Eleventh Circuit applies a seven factor test: "(1) strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the

consuming public." <u>Tana</u>, 611 F.3d at 774-75 (quoting <u>Welding Servs., Inc. v.</u> <u>Forman</u>, 509 F.3d 1351, 1360 (11th Cir. 2007)). The Court concludes that only one of these factors weighs in favor of a likelihood of confusion and the others weigh heavily against it.  TenCate has established it has rights to the Evolution trademark and its "Evolution 3GS" mark became incontestable in 2011, indicating the mark is presumptively strong.  (<u>See</u> Defs.' Br. in Opp'n to Pls.' Mot. for Partial Summ. J., Exs. 47-50); <u>Dieter v. B&H Indus.</u>, 880 F.2d 322, 329 (11th Cir. 1989).  In this case, however, the Plaintiffs have overcome that presumption.   At the time that the Plaintiffs introduced the Revolution product, the Evolution fiber had been sold exclusively to FieldTurf in the United States.  With trivial exceptions, the Evolution product had not been advertised or promoted.   Therefore, the mark should be considered as a weak mark.  The difference between "Evolution" and "Revolution" is only a single letter, and the words are pronounced similarly.  But the purchasers of both products are sophisticated purchasers of technical products who are not likely to be deceived by the similar sound of two very different words.  Soon after the parties ended their agreements, FieldTurf rolled out its Revolution product with the motto: "It's not evolution, it's Revolution."  (<u>See</u> Defs.' Br. in Opp'n to Pls.' Mot. for Partial Summ. J., Ex. 3, at BCS00001090).  But it makes no sense to think that the Plaintiffs were trying to get its customers to think that they were getting the Evolution product

that FieldTurf was saying was defective.  FieldTurf and TenCate deal with consumers at different stages of the purchasing process.  FieldTurf sells artificial turf to athletic facilities.   TenCate sells fiber to other manufacturers of artificial turf; that is, FieldTurf's competitors.  Finally, the evidence of actual confusion is de minimis.  As noted above, the buyers of both products are sophisticated purchasers of highly technical products who are unlikely to be confused.

3.   Defamation Claims

The Plaintiffs move for summary judgment on the Defendants' counterclaims for slander, libel, and tortious interference.

a.   Slander

FieldTurf argues that TenCate's claim for slander should fail because TenCate has provided no competent evidence, only hearsay, of any slanderous statements made by FieldTurf.  In Georgia, slander or oral defamation requires proof that the statement "was (1) false, (2) malicious, and (3) published." Davita Inc. v. Nephrology Assocs., P.C., 253 F. Supp. 2d 1370, 1375 (S.D. Ga. 2003) (citing Information Sys. & Networks Corp. v. City of Atlanta, 281 F.3d 1220, 1228 (11th Cir. 2002)); see also O.C.G.A. § 51-5-4.  TenCate's evidence of false statements consists of an email from Senior Accounts Manager Matt Riggs discussing several projects and mentioning that Robert Hawke told Riggs he went to the FieldTurf Architect Roundup in Tampa and

heard the FieldTurf president give a speech saying that FieldTurf's "suppliers were doing a 'bait and switch' by submitting top quality products but actually substituting much lower quality yarns upon delivery."  (See Defs.' Resp. in Opp'n to Pls.' Mot. for Partial Summ. J., Ex. 25).  TenCate contends FieldTurf often used the phrase "bait-and-switch" to describe its allegations in this lawsuit.  (Id., Ex. 4).  Next, TenCate references an article in the *Beaumont Enterprise* quoting a local school superintendent's statement that he had been informed by FieldTurf that TenCate supplied FieldTurf with a "bad batch of turf" and citing a statement from FieldTurf's marketing department "confirming its belief that it was supplied with 'defective fiber.'"  (Id., Ex. 22).

The statements relayed in the Riggs email and in the *Beaumont Enterprise* article are inadmissible hearsay that cannot be used to defeat summary judgment. See Draper v. Reynolds, 278 Ga. App. 401, 406 (2006) (concluding, at summary judgment stage, that inadmissable hearsay could not support claim for slander).  There is no testimony from Robert Hawke himself concerning the statement, only the emailing summarizing what Hawke apparently informed Riggs that he had heard. Likewise, there is no testimony from the superintendent mentioned in the *Beaumont Enterprise* article, only the article itself which summarizes what the superintendent told the *Enterprise* he had been told by FieldTurf. These hearsay statements cannot

support a claim for slander.  See id. (concluding that alleged defamatory statement supporting claim for slander was inadmissible hearsay because there was no deposition or affidavit testimony from the witness who relayed the statement to the plaintiff).  Further, the statement from FieldTurf's marketing department relayed in the *Beaumont Enterprise* article is a statement of belief or opinion that cannot support a claim for slander.  See Chaney v. Harrison & Lynam, LLC, 308 Ga. App. 808, 811 (2011) ("as a general rule, a mere statement of opinion is not considered defamatory").  Accordingly, because TenCate has not provided sufficient evidence of a false statement, FieldTurf's motion for partial summary judgment should be granted on TenCate's counterclaim for slander.

b.   Libel

TenCate argues that statements FieldTurf made about this lawsuit, in particular statements contained in a form letter sent to FieldTurf contacts, were libelous. (See Defs.' Br. in Opp'n. to Pls.' Mot. for Partial Summ. J., Ex. 4).  "A libel is a false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule."  Fine v. Communication Trends, Inc., 305 Ga. App. 298, 302 (2010) (quoting O.C.G.A. § 51-5-1(a)).  FieldTurf contends that the allegedly libelous statements it made concerning this lawsuit were privileged attempts to protect its

interest and therefore non-actionable.  "'Statements made with a good faith intent on the part of the speaker to protect his or her interest in a matter in which it is concerned' are deemed privileged."  Id. (quoting O.C.G.A. § 51-5-7).  To earn the defense of privilege, FieldTurf must show "good faith, an interest to be upheld, a statement properly limited in its scope, a proper occasion, and publication to proper persons."  Id. (quoting Rabun v. McCoy, 273 Ga. App. 311, 316 (2005)).

In Fine, the defendant charged with libel had sent a letter to its clients informing them of pending litigation against the plaintiff alleging slander.  The letter only described the issuance of a temporary restraining order against the plaintiff and outlined the defendant's allegations that the plaintiff had disseminated misinformation and unlawfully solicited its clients.  The defendant's president testified with respect to the slander claim that he only provided the letter to clients whose business relationships were at risk.  The court concluded that the letter was properly limited in scope because it only described the restraining order and restrictive covenants, and was only sent to a limited set of customers.  Id. at 303.

Here, there is evidence suggesting that the letter that Gill wrote describing the lawsuit and FieldTurf's allegations was widely disseminated.  Eric Daliere directed FieldTurf's North American Sales Team to reach out to the design community to address concerns clients may have about the litigation in an email attaching the form

letter about the lawsuit.  (See Defs.' Br. in Opp'n. to Pls.' Mot. for Partial Summ. J.,

Ex. 6 at FT00143437).  Likewise, Darren Gill testified the salesmen had the discretion

to send the letter describing the lawsuit to whomever they saw fit.  (Gill Dep. at 220-

21).  However, the letter here is limited in scope as the letter in Fine.  Here, FieldTurf's

form letter repeats the allegations that "Mattex/TenCate changed its fiber formula and

the manufacturing process that it used to create the fiber," and then goes on to state

that "this issue ... has everything to do with a third party supplier that, in simple terms,

did not live up to what they were providing us.  Thus the reason FieldTurf Revolution

was born."  (See Defs.' Br. in Opp'n. to Pls.' Mot. for Partial Summ. J., Ex. 4).

Essentially, the letter simply repeats the allegations of the lawsuit.  Protecting its

reputation and the quality of its ongoing production in this manner was privileged.

### 4.    Tortious Interference with Business Relations

FieldTurf argues that TenCate's claim for tortious interference with business

relations should fail because TenCate has not shown the statements FieldTurf made

were non-privileged and because TenCate has not shown it suffered any financial loss

due to FieldTurf's statements.  "The essential features of a cause of action for tortious

interference with business relations are that the defendant, acting improperly, without

privilege, and with the malicious intent to injure plaintiff, induces a third party not to

enter into or to continue a business relationship with plaintiff, which causes plaintiff

financial injury." <u>Lively v. McDaniel</u>, 240 Ga. App. 132, 134 (1999) (citing <u>Jenkins v. General Hosps. of Humana</u>, 196 Ga. App. 150, 151 (1990)).  Here, the Court has concluded that FieldTurf's statements concerning the lawsuit and the unrolling of Revolution were privileged.  Furthermore, TenCate has not demonstrated that it suffered financial injuries due to statements made by FieldTurf.  TenCate points to the declaration of a former account manager for Polyloom who contacted three customers in an effort to sell Evolution should it be released on the market.  Each of these three customers declined to wholeheartedly adopt Evolution for various reasons, saying it has "a lot of baggage," saying they did not know the extent to which Evolution's image had been damaged, and saying it would not independently promote Evolution. (<u>See</u> Defs.' Br. in Opp'n to Pls.' Mot. for Partial Summ. J., Ex. 24, Riggs Decl. ¶¶ 6-8).  The statements that Riggs relates from these customers do not indicate that the customers were affected by any FieldTurf statement, whether about the lawsuit or a TenCate product.

TenCate next argues that three sales, to the Aledo Independent School District, Barron Collier High School, and Alma College, were lost due to the allegedly defamatory statements made by FieldTurf.  First, TenCate argues that the Aledo Independent School District chose to buy FieldTurf's Revolution product instead of its Duraspine product which contained Evolution.  However, the emails between

FieldTurf and Aledo show that FieldTurf was preparing to replace degrading fibers at Aledo's field pursuant to its warranty but that, due to the pending litigation between FieldTurf and TenCate, FieldTurf was required to give TenCate an opportunity to inspect the field before the repairs were made. (See Defs.' Br. in Opp'n to Pls.' Mot. for Partial Summ. J., Ex. 13). The emails further show that FieldTurf offered Aledo several options, including Duraspine and Revolution, and that Aledo was "leaning towards" and ultimately purchased the Revolution product. (Id., Exs. 17, 18). There is nothing in the emails to indicate that Aledo's decision was swayed by FieldTurf's statements about TenCate or the lawsuit, and in the email confirming the agreement to replace the field, FieldTurf never mentions TenCate, and FieldTurf promotes Revolution only by saying it has outstanding test results and is "manufactured by FieldTurf and not a third party supplier." (Id., Ex. 17). Similarly, although the purchaser at Barron Collier ultimately chose Revolution to replace its field despite initially leaning toward Duraspine, the allegedly libelous information it received about the lawsuit that may have influenced its decision was in direct response to the facilities manager's questions: "May I have a copy of the analysis performed by FieldTurf that influenced the decision to market the upgrade material (Revolution) as an 8 year product (will last 8-10 years)?" and "Was there a comparison done between Revolution and the material currently installed on Barron Collier HS's field or other

manufacturer's material?"  (See Defs.' Br. in Opp'n to Pls.' Mot. for Partial Summ. J., Ex. 10).  FieldTurf's responses to these direct inquiries do not constitute improper communications capable of supporting a claim for tortious interference with business relations.  See Lively, 240 Ga. App. at 134 (requiring that disseminator of tortious statements be "acting improperly").

Finally, TenCate contends that it lost a sale to Alma College due to FieldTurf's defamatory statements.  However, TenCate's evidence only shows a lengthy email discussion in which Alma representatives are seeking information about the durability of variously colored turfs, in which FieldTurf sales staff respond by informing Alma that TenCate's warranties only cover three years of colored turf (including by copying emails from TenCate confirming the warranty period), and in which Jamie MacDonald recommends that Alma choose Revolution because it has an eight year warranty on its colored turf.  (See id., Ex. 19).  There is no indication that these emails involved an improper statement because the TenCate warranties did in fact only last three years and, further, there is no indication that Alma chose Revolution for any reason other than to obtain the longer warranty.  Accordingly, the Defendants have not shown that they suffered financial injury from any improper statements made by the Plaintiffs, and the Plaintiffs' motion for partial summary judgment with respect to tortious interference with business relations should be granted.

B.     The Defendants' Motion for Summary Judgment

1.     Fraud

The Defendants argue for summary judgment on two separate grounds with respect to the Plaintiffs' claim for fraud.  First, the Defendants argue that TenCate ME did not assume liability for claims for fraud when it acquired Mattex.  Second, the Defendants argue that the Plaintiffs have not produced evidence to satisfy the elements to prove fraud.

In its December 2012 Order, the Court held that it could not determine whether TenCate ME assumed liability for fraud claims stemming from representations Mattex made prior to its acquisition by TenCate, only that the Asset Purchase Agreement seemed to have "no limitation on the types of claims for which TenCate [] ME assumed liability."  See [Doc. 53], at 19.  TenCate now contends it has produced sufficient evidence to show that it did not assume liability for claims connected to Mattex's alleged fraud.  TenCate argues that the Asset Purchase Agreement and its references to the Adjustment Statement and the Data Room documents reviewed during the merger demonstrate that TenCate ME only assumed a limited amount of liability for claims brought against Mattex.  The Court concludes that the Asset Purchase Agreement is ambiguous and that, relying on parol evidence to resolve the

ambiguity, the contract did require TenCate ME to assume liability for the fraud alleged here.

"Generally, a purchasing corporation does not assume the liabilities of the seller unless: (1) there is an agreement to assume liabilities; (2) the transaction is, in fact, a merger; (3) the transaction is a fraudulent attempt to avoid liabilities; or (4) the purchaser is a mere continuation of the predecessor corporation." Bullington v. Union Tool Corp., 254 Ga. 283, 284 (1985).  FieldTurf argues that the Asset Purchase Agreement was an agreement to assume liability for Mattex's fraud.  TenCate argues that the agreement specifically limits liabilities for claims to those already pending against Mattex and that the assumption of liability under the agreement is limited to the liabilities contemplated in the "Data Room" documents and in the Adjustment Statement.

Section 2.3 of the Asset Purchase Agreement provides for Exclusions and Assumed Liabilities.  (See Defs.' Mot. for Summ. J., Ex. O, at 10).  While these provisions state that "the Purchaser shall not assume any liability or obligation in respect of the Business which is not specifically assumed by it under this Agreement," section 2.3 further states that "the Purchaser agrees and acknowledges that from the Transfer Date it shall assume all Assumed Liabilities and all Defective Product Claims."  (See id. §§ 2.3(B) & (C)).  "Assumed Liabilities" are defined as "all

liabilities of the Business arising prior to or as a consequence of the conduct of Business prior to Completion to the extent that the same are provided for in the Adjustment Statement." (Id. at 2). The Adjustment Statement is a statement of Adjusting Working Capital prepared pursuant to schedule 5 of the Asset Purchase Agreement which provides specific directions for valuating inventory and receivables. (Id. at 2, 42-44; Ex. P). According to the agreement's definitions, "'Data Room' means the documents disclosed in the data room set up by the Vendor at the Premises and any other documents disclosed to the Purchaser or its advisers, in each case, as set out in the index in the form attached as schedule 11." (Id. at 3).

Contrary to TenCate's contention, with respect to the "Data Room" documents, there is nothing on the face of the contract connecting the Assumed Liabilities with the Data Room documents. Further, the documents in the Data Room include "Details of any claim by or against the company" which only lists four apparently pending matters and makes no mention of liability for future or unasserted claims. (Id. at 85, § 2.10; Ex. Q). Likewise, the Adjustment Statement merely lists "Provision for Warranties & Claims" and gives a figure of 325.029 AED, without providing any details on the actual claims included. (Defs.' Mot. for Summ. J., Ex. P). The Data Room documents and the Adjustment Statement do not, therefore, demonstrate that TenCate only agreed to assume pending liabilities. Indeed, the Asset Purchase

Agreement specifically requires the contracting parties to continue to address ongoing liabilities:

> The Purchaser covenants that on or after Completion it will execute and deliver all such further instruments as the Vendor may from time to time reasonably request in order to effect the release and discharge in full of the Vendor and the Investors in respect of any Assumed Liability or Defective Product Claim, the Purchaser's assumption of that Assumed Liability or Defective Product Claim and the substitution of the Purchaser as the primary obligor of that Assumed Liability or Defective Product Claim on a non-recourse basis to the Vendor or the Investors.

(Id. § 2.3(E)).  This suggests that the parties contemplated the emergence of future claims because it describes a procedure by which the selling parties can effectively move the liability to the purchaser, TenCate.  In sum, because there is nothing in the agreement connecting the Assumed Liabilities or the Adjustment Statement with the Data Room documents, and because there is nothing in any of the subsections indicating that specific subsets of claims were not to be included, the contract does not unambiguously state that liabilities outside those contemplated in the Data Room documents were not assumed by the purchaser.

Although the Asset Purchase Agreement does not seem to limit the types of claims for which TenCate assumed liability, the contract is somewhat ambiguous and the Court will look to parol evidence to resolve the ambiguity.  See Taylor Freezer Sales Co. v. Hydrick, 138 Ga. App. 738, 739 (1976).  Both parties have provided parol evidence supporting their interpretations of the contract.  The Defendants point to an

email between Mattex's Marco Reefman and TenCate ME's Jaap Lock discussing "provisions for claims." (See Defs.' Mot. for Summ. J., Ex. S). These emails lay out an "overview of claims and other pay outs done in 2006 and the remaining claim provision." (Id.) Although this email lays out Mattex's provisions to cover claims in 2006 and early 2007, it does not, as the Defendants contend, demonstrate that "the sole intent of the parties was that TenCate was to accede to these specific claims." (Id. at 15). Rather, the email shows that Mattex was providing TenCate with information on the claims it faced *during 2006*.

The Plaintiffs' parol evidence is more compelling. In an email conversation between Lock and Chris Turner, an attorney for TenCate on the transaction, Turner warned that the "amount of Assumed Liabilities is not capped - *As discussed, ordinarily in an assets deal the liabilities would be retained by the vendor other than specifically identified and capped liabilities. The [current] wording places a great deal of risk on the Purchaser regarding the liabilities.* (See Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J., Ex. 52, at TENCATE0038351) (emphasis in original). Lock responded that "[t]he intercompany liabilities must be excluded. That was agreed. Other liabilities will be taken over indeed, but sufficient provisions/accruals must be available to pay out those liabilities. If you would leave all liabilities at the seller, you might have the risk that those claims will not be properly treated, since the

seller has no interest anymore.  That could hurt the continuity of the business as the customer still considers TenCate to continue the business of Mattex." (Id.)  Further, Marc Verleyen, a member of Mattex's Board of Directors, testified in his deposition that he was worried about his personal liability for future claims brought against Mattex until April 2007 when TenCate assumed those liabilities.  (See Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J., Ex. 3, Verleyen Dep. at 156-57).  The parol evidence establishes that Mattex intended for TenCate to assume all future liabilities for claims brought against Mattex, and that TenCate intended to assume these liabilities so it could maintain positive relations with its customers.  There is nothing in the Asset Purchase Agreement suggesting that the claims TenCate ME assumed liability for did not include FieldTurf's claim for fraud.  Therefore, TenCate can be held liable for Mattex's fraud, and the Defendants' motion for summary judgment should be denied on those grounds.

The Defendants also argue that the Plaintiffs have not provided sufficient evidence of fraud to survive summary judgment.  "[T]he common law tort of fraud requires five elements: (1) a false representation by the defendant; (2) with scienter, or knowledge of the falsity; (3) with intent to deceive the plaintiff or to induce the plaintiff into acting or refraining from acting; (4) on which the plaintiff justifiably relied; (5) with the proximate cause of damages to the plaintiff."  Prince Heaton

Enters., Inc. v. Buffalo's Franchise Concepts, Inc., 117 F. Supp. 2d 1357, 1360 (N.D. Ga. 2000).  The Court concludes the Plaintiffs have provided sufficient evidence to create an issue of fact with respect to its fraud claim.  First, the Plaintiffs have provided evidence to show that Mattex provided samples and test results to FieldTurf that were not the same as the product it ultimately sold to FieldTurf.  (See, e.g., Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J., Ex. 19, Expert Report of Dr. Charles Daniels, at 44-47; Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J., Ex. 22, Willard Dep. at 164-65 (confirming Dr. Daniels' determination that the samples Mattex provided contained five times more Uvinol than the samples Mattex provided to FieldTurf as product)).  The provisions of lower-performing turf following the representations and test results of higher-performing turf, which induced FieldTurf to order the turf, is sufficient to show a question of fact concerning misrepresentation, scienter, intent to induce, and reliance.  See Prince Heaton Enters., 117 F. Supp. 2d at 1360.  FieldTurf has also shown that the replacement costs on fields it built using Mattex products will be substantial, creating an issue of fact to satisfy the final element of fraud. (See Pls.' Resp. to Defs.' Mot. for Summ. J., Ex. 71, at 11, 18-19). Accordingly, the Defendants' motion for summary judgment should be denied on those grounds.

2.    Breach of Contract

The Defendants argue that the Plaintiffs have not shown the breaches of the 2005, 2006, and 2008 Agreements were more than de minimus. The parties agree that Georgia law governs the breach of contract claims for the 2005 and 2006 Agreements. "The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." Kuritzky v. Emory Univ., 294 Ga. App. 370, 371 (2008) (citing Odem v. Pace Academy, 235 Ga. App. 648, 653 (1998)). "[T]he breach must be more than de minimus and substantial compliance with the terms of the contract is all that the law requires." Id. (citing Dennard v. Freeport Minerals Co., 250 Ga. 330, 332 (1982)).[3] Here, FieldTurf has produced some evidence that 167 of its fields have failed due to the Evolution fiber's performance. (See Skibell Decl. ¶ 2; Pls.' Resp. to Defs.' Mot. for Summ. J., Ex. 19 at 7, 47-51). FieldTurf's damages expert opines that failures resulting from the Evolution fiber will amount to at least $21.3 million in

---

[3]The 2008 Agreement is governed by New York law. (See Defs.' Mot. for Summ. J., Ex. T, at 11 ¶ E). "Under New York law, 'the elements of a cause of action to recover damages for breach of contract are (1) the existence of a contract, (2) the plaintiff's performance under the contract, (3) the defendant's breach of the contract, and (4) resulting damages.'" Jalee Consulting Group v. XenoOne, Inc., No. 11-civ-4720, 2012 U.S. Dist. LEXIS 142056, at *22 (S.D.N.Y. Sep. 29, 2012) (quoting Palmetto Partners, L.P. v. AJW Qualified Partners, LLC, 83 A.D.3d 804, 806 (N.Y. App. 2011)). Under the 2008 Agreement, as for the 2005 and 2006 Agreements, the Plaintiffs have provided sufficient evidence to create an issue of fact with respect to damages incurred as a result of the breach.

damages.  (Pls.' Resp. to Defs.' Mot. for Summ. J., Ex. 71, at 11, 18-19).  Although the Defendants argue these failures only amount to a small percentage of the Evolution fields installed, the Plaintiffs' evidence is sufficient to create an issue of fact with respect to the breaches of the 2005, 2006, and 2008 Agreements.  Accordingly, the Defendants' motion for summary judgment should be denied with respect to the Plaintiffs' claims for breach of contract.

3.    <u>Statute of Limitations for Breach of Warranties</u>

The Defendants argue that the four-year statute of limitations in Georgia, <u>see</u> O.C.G.A. § 11-2-725, bars the Plaintiffs from bringing breach of warranty claims with respect to the 2005, 2006, and 2008 Agreements.  The parties signed a tolling agreement on November 22, 2010, thus preserving any causes of action that accrued before that date.  (<u>See</u> Pls.' Resp. in Opp.'n to Defs.' Mot. for Summ. J., Ex. 62).  Both the 2006 Agreement and the 2008 Agreement were signed after November 22, 2006, so claims stemming from those warranties could not have been time-barred by November 22, 2010.  (<u>See</u> Compl., Ex. C, at 1 (showing the 2006 Agreement is dated November 29, 2006); Defs.' Mot. for Summ. J., Ex. T, at 1 (showing the 2008 Agreement is effective from July 1, 2008)).

The parties entered into the 2005 Agreement on September 1, 2005, and FieldTurf received over 80 shipments of Evolution before the contract ended in

December 2006. (See Defs.' Mot. for Summ. J., Ex. U). In Georgia, "[a] breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered." O.C.G.A. § 11-2-725(2). The warranty in the 2005 Agreement extended for a minimum of six years and a maximum of nine years following installation. (See Defs.' Mot. for Summ. J., Ex. J). Thus, for the 2005 Agreement, the cause of action for the breach of warranty accrued when FieldTurf should have discovered the breach. See O.C.G.A. § 11-2-725(2). The Defendants argue that several emails sent by FieldTurf in early 2006 demonstrate that FieldTurf was aware of the breaches of warranty. (See Defs.' Mot. for Summ. J., Ex. Y). However, this argument is belied by the fact that Mattex provided reassurances to FieldTurf concerning the Evolution product later in 2006. In June 2006, after FieldTurf had expressed concern about the degradation of the Plessis-Robinson field, van Balen wrote an email to FieldTurf management stating that the "[c]hances that this field has issues that are related to the yarn [the Evolution product] are almost zero." (See Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J., Ex. 66). Van Balen further stated that, "in spite of this Mattex want [sic] to resolve the issue as it is bad promotion for FieldTurf Tarkett and for Mattex." (Id.) These reassurances create an

issue of fact as to whether FieldTurf should have been aware of the problems in the

Evolution yarn covered by the 2005 Agreement's warranty prior to November 22,

2006. Accordingly, the Defendants' motion for summary judgment should be denied

in this respect.

### 4.    Statute of Limitations for Fraud

The Defendants argue that the fraud claim arising from the 2005 Agreement is

barred by the four-year statute of limitation applicable in Georgia. See O.C.G.A. § 9-

3-31. The parties signed a tolling agreement on November 22, 2010. (See Pls.' Resp.

in Opp.'n to Defs.' Mot. for Summ. J., Ex. 62). The Court concludes there is an issue

of fact whether the Plaintiffs should have been aware of the failure in the TenCate

fibers prior to November 22, 2006. See O.C.G.A. § 9-3-96 ("the period of limitation

shall run only from the time of the plaintiff's discovery of the fraud"). As discussed

above, FieldTurf has provided evidence that, in June 2006, Mattex reassured FieldTurf

the problems FieldTurf was having with its Plessis-Robinson field were not related

to TenCate's yarn, and at that time there was no reason for FieldTurf to question the

reassurances. (See Pls.' Resp. in Opp.'n to Defs.' Mot. for Summ. J., Ex. 66 at

TENCATE0007581-82). Accordingly, FieldTurf has created at least an issue of fact

as to whether it became aware of TenCate's alleged fraud prior to November 22, 2006,

and summary judgment should be denied.

5.     The Exculpatory Language in the 2006 Warranty

TenCate argues that FieldTurf's claim for damages under the 2006 Warranty

and Agreement, whether for fraud or for the breach itself, must be limited to the cost

of the fibers.  As noted in the Court's Order on the Defendants' motion to dismiss, the

2006 Warranty is governed by United Arab Emirates law.  (See Defs.' Mot. for

Summ. J., Ex. M ¶ 11).  At issue is a clause in the warranty stating:

> LIMITATION OF REMEDY AND LIABILITY: THE REMEDIES
> SPECIFIED IN THIS LIMITED WARRANTY SHALL BE THE SOLE
> MEANS OF REDRESS FOR THE PURCHASER WITH RESPECT TO
> ANY CLAIM ARISING OUT OF PURCHASER'S PURCHASE OF
> THE PRODUCTS.  IN NO EVENT, REGARDLESS OF THE FORM
> OF THE CLAIM OR CAUSE OF ACTION (WHETHER BASED IN
> CONTRACT, NEGLIGENCE, STRICT LIABILITY, OTHER TORT,
> MISREPRESENTATION OR OTHERWISE), SHALL MATTEX'S
> LIABILITY TO PURCHASER AND/OR ITS CUSTOMERS FOR
> DIRECT LOSSES, COSTS, DAMAGES, EXPENSES OR OTHER
> LIABILITIES ARISING OUT OF OR CONNECTED WITH THIS
> LIMITED WARRANTY EXCEED THE ORIGINAL PURCHASE
> PRICE OF THE PRODUCTS.
>
> IN NO EVENT SHALL MATTEX'S LIABILITY TO THE
> PURCHASER OR ANY OTHER PARTY EXTEND TO INCLUDE
> SPECIAL, INDIRECT, CONSEQUENTIAL, OR PUNITIVE
> DAMAGES, OR ANY LOSS OF ANTICIPATED PROFITS, LOSS OF
> USE, LOSS OF REVENUE AND COST OF CAPITAL.

(Id. ¶ 3).  The parties have submitted affidavits from competing experts concerning

whether UAE law would enforce this exculpatory clause.  Both experts agree that

"under the UAE Civil Law where the seller of goods commits fraud to induce the sale,

and the buyer relies on the fraud in making the purpose, any limitations of liability will not be enforced under UAE law." (Nabeel Decl. ¶ 28; Second Wolfson Decl. ¶ 10).  TenCate's expert, Tareq S. Nabeel, however, opines that the commercial code of the UAE should take precedence over the civil code, and argues that the commercial code places obligations on buyers when they receive defective products and allows for reasonable limitations on liabilities between corporate entities. (Nabeel Decl. ¶¶ 18-40).  He also contends that the consumer protection law discussed by FieldTurf's expert has not been tested by the UAE courts and does not alter his conclusion.  (Id. ¶ 40).  FieldTurf's expert, Herbert S. Wolfson, contends that the commercial code in the UAE is silent on limitations of liability for fraud and that the provisions Nabeel contends address limitations on liability actually only address the doctrines of substantial performance and rescission.  (Second Wolfson Decl. ¶¶ 15-20).  Wolfson further contends that the consumer protection law, albeit a new law, applies to business transactions and voids any contractual clauses limiting a manufacturer's liability for damages.  (Id. at ¶¶ 24-30) (noting that the consumer protection law applies to both juristic and physical persons).

The Court concludes that, based on the testimony of both experts, the clause in the warranty removing liability for actions arising from fraud is void under UAE law. Even assuming the commercial code takes precedence over the civil code in this

situation, the portions of the commercial code cited by Nabeel, sections 110 and 111, only state the obligations placed on a buyer when it receives defective goods. (See Nabeel Decl. ¶¶ 24-27).  These sections of the commercial code cited do not address the validity of clauses seeking to limit liability for torts such as fraud.  The civil code, on the other hand, specifically states that "any condition purporting to provide exemption from a harmful act should be void."  (Second Wolfson Decl. ¶ 22). This code section would not permit TenCate/Mattex to avoid liability for fraud through an exculpatory clause.  Because Wolfson has provided statutory authority for his proposition that limitations of liability for fraud are void, and because Nabeel has provided no clearly contrary authority and no reason to doubt Wolfson's contentions, the Court concludes that the UAE law would not enforce the limitation of liability for fraud contained in the 2006 Warranty.

However, the Court concludes that UAE law would permit the limitation on contractual damages to the price paid by FieldTurf. (See Defs.' Mot. for Summ. J., Ex. M ¶ 3).  Article 2 of the UAE commercial code provides that "Traders and commercial activities shall be governed by the agreement entered into by the two contracting parties unless such agreement contradicts an imperative commercial text," suggesting that the parties' agreement is controlling.  (Nabeel Decl. ¶ 24).  Wolfson contends that the consumer protection law would take precedence over the commercial code and

void any limitation of liability.  The text of the consumer protection law suggests that the law would apply to this business transaction, even though the law has not been frequently used by UAE courts. (See Second Wolfson Decl. ¶¶ 25-30).  Nabeel, however, notes that the consumer protection law provides the right of compensation to a consumer "in accordance with the general principles of law in force."  (Nabeel Decl. ¶ 41).  Article 2 of the commercial code articulates the general principle that contracts among commercial entities are controlling unless they "contradict an imperative commercial text."  (Id. ¶ 24). Wolfson does not argue that the consumer protection law is an "imperative commercial text" that would override the parties' contract as written or that the consumer protection law would override the general principle of law that agreements made by commercial entities are controlling in most situations.   Accordingly, FieldTurf's recovery under the 2006 Warranty itself is limited to the cost paid by FieldTurf.

### 6.    The Plaintiffs' Damages

The Defendants offer several arguments to limit or preclude the Plaintiffs' claims for damages.  They argue that the Plaintiffs' claims for damages for fraud are barred by the merger clause in the 2006 Agreement, that the Plaintiffs' damages in general are limited to the cost of replacing the defective fibers, that the 2008 Agreement superseded the 2005 and 2006 Agreements and prevents the recovery of

damages under the earlier agreements, and that the economic loss doctrine in Georgia limits FieldTurf's potential recovery.

First, the Defendants contend that any fraud action relating to the 2006 Agreement must fail because that agreement contained a merger clause stating that the agreement and its warranty "represents the entire agreement of the parties and supersedes any prior or contemporaneous agreements with respect" to the terms of the agreement.  (See Defs.' Mot. for Summ. J., Ex. M ¶ 7).  However, FieldTurf has provided evidence suggesting that Mattex continued to make misrepresentations concerning the Evolution product after making deliveries pursuant to the 2006 Agreement.  (See Pls.' Resp. in Opp.'n to Defs.' Mot. for Summ. J., Ex. 66 at TENCATE0007581-82).  This evidence is sufficient to create an issue of fact as to whether misrepresentations were made following the entering of the 2006 Agreement.

Next, the Defendants argue that the limitation of damages in the 2005 Agreement preclude the Plaintiffs from recovering the costs of removal and re-installation of defective products and also limits the Plaintiffs' recovery for fraud.  However, the limitation provision only limits the recovery available under the warranty.  (See 2005 Agreement, Ex. J, ¶¶ 4 & 5).  There is nothing to suggest that the provision also limits the recovery available for fraud or any other torts arising from the agreement itself.  See Willoughby Roofing & Supply Co. V. Kajima Intern., Inc.,

776 F.2d 269, 270 n.2 (11th Cir. 1985) (noting "the totally independent nature of claims for breach of contract and for the tort of fraud").  Accordingly, the damages for fraud arising from the 2005 Agreement are not limited by the language in the agreement limiting recovery under the warranty.

The Defendants also argue that the 2008 Agreement superseded the 2005 and 2006 Agreements.  When multiple contracts are entered into by the same parties at different times, "[a]n existing contract is superseded and discharged whenever the parties subsequently enter upon a valid and inconsistent agreement completely covering the subject-matter embraced by the original contract."  Wallace v. Bock, 279 Ga. 744, 746 (2005) (citing Hennessy v. Woodruff, 210 Ga. 742, 744 (1954)).  Here, the 2005 and 2006 Agreements cover different subject matter than the 2008 Agreement, namely the time period that they are intended to be in effect.  (See Defs.' Mot. for Summ. J., Ex. I, at 2 (noting that the 2005 Agreement runs until December 31, 2006); Compl., Ex. C, at 2 (noting that the 2006 Agreement runs until December 31, 2007); Defs.' Mot. for Summ. J., Ex. T, at 1 (noting that the 2008 Agreement is effective from July 1, 2008 through December 31, 2011)).  Thus, the provision in the 2008 Agreement stating that the agreement "supersedes all prior written proposals, negotiations, and/or communications between the parties relating to the Agreement" does not indicate that the 2008 Agreement supplanted the 2005 and 2006 Agreements,

only that the 2008 Agreement itself is fully integrated.  (<u>See</u> Defs.' Mot. for Summ.

J., Ex. T § XIV(F)).  However, the limitations of liability contained in the 2008

Agreement are applicable to the breach of the 2008 Agreement itself, and the Plaintiffs

do not appear to argue otherwise.  (<u>See</u> <u>id.</u> at § XIV(F)).

Finally, the Defendants argue that Georgia's economic loss rule prevents

FieldTurf from recovering damages for field repairs and replacement costs because

that would permit the field owners to make double recoveries.  (<u>See</u> Defs.' Mot. for

Summ. J., at 36).  FieldTurf contends there is no risk of double recovery because

TenCate has no contractual relationship with the field owners and made no

representations to the field owners.  Indeed, FieldTurf contends the field owners could

bring claims against FieldTurf, but only FieldTurf can bring a claim against TenCate,

as they are the only parties in privity.  TenCate did not respond to FieldTurf's

contentions in its reply, and the Court agrees with FieldTurf's analysis.  <u>See</u> <u>General</u>

<u>Electric Co. v. Lowe's Home Centers, Inc.</u>, 279 Ga. 77, 80 (2005) (noting that the

economic loss rule is intended to prevent "duplicative liability [to multiple parties and

non-parties] for the same damage").  Accordingly, FieldTurf's damages are not

limited by the economic loss doctrine.

## IV.  <u>Conclusion</u>

For the reasons set forth above, the Plaintiffs' Motion for Partial Summary Judgment [Doc. 354] is GRANTED and the Defendants' Motion for Summary Judgment [Doc. 358] is DENIED.

SO ORDERED, this 10 day of May, 2013.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge